2020 IL App (1st) 180518

No. 1-18-0518

Opinion filed September 29, 2020.

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 0015301 |
| | ) | |
| FIRAS AYOUBI, | ) | The Honorable |
| | ) | Garrit E. Howard and Jeffrey |
| Defendant-Appellant. | ) | Warnick, |
| | ) | Judges Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment and opinion.

OPINION

¶ 1    Following a jury trial, defendant Firas Ayoubi was found guilty of aggravated criminal sexual assault predicated on kidnapping and was sentenced to 28 years' imprisonment. On appeal, he challenges eyewitness identifications, the sufficiency of the evidence, the propriety of the jury instructions, the prosecutor's closing arguments, and the admission of historical cell site data. For the following reasons, we affirm the trial court's judgment.

¶ 2                                    I. Background

¶ 3                              A. Pretrial Proceedings

¶ 4      Defendant was indicted with several charges pertaining to an assault against Y.L. shortly after 8 a.m. on December 4, 2012, at Palm Beach Tan (5653 West Touhy Avenue). One count alleged that defendant "committed the offense of aggravated criminal sexual assault in that he, knowingly committed an act of sexual penetration upon [Y.L], to wit: [defendant] placed his penis in [Y.L.'s] mouth, and the criminal sexual assault was perpetrated during the course of the commission of any other felony, to wit, kidnapping, by [defendant]." Another count alleged that defendant committed kidnapping when he "knowingly by force or threat of imminent force carried [Y.L.] from one place to another with intent secretly to confine [Y.L.] against her will." See 720 ILCS 5/10-1(a)(2) (West 2012). Before trial, defendant moved to suppress photo array and physical lineup identifications, arguing they were unduly suggestive.

¶ 5      At a hearing on the motion, Sergeant Alexopoulos testified that he met with witness Joseph Reilley in the parking lot of Palm Beach Tan shortly after the incident. Reilley described the offender as a dark-haired Caucasian or Hispanic man, with a light complexion, between 20 and 30 years of age. Reilley added that the offender, who was about 5'8" tall, wore layers of clothing under a dark-colored hoodie and wore a bandana which partially covered his thin face. Reilley said the man appeared to be dirty. Additionally, Y.L., who had gone to the hospital, returned to Palm Beach Tan and described the offender as a Hispanic man between 18 years of age and his early twenties. Y.L. told Sergeant Alexopoulos the offender was very thin and tall, had dark hair and dark eyes, and wore a green hoodie with white lettering. He also wore black pants, black cotton gloves, and a black cotton mask, which covered the bottom half of his face.

¶ 6      Sergeant Alexopoulos testified that he created a photo array that included defendant as a suspect. He chose other individuals with short, cropped hairstyles similar to the hairstyle worn in defendant's photograph, although neither witness had described the offender's hairstyle. Conversely, Sergeant Alexopoulos did not choose fillers based on their weight. The next day, he read Y.L. a preprinted form stating that she was not required to make an identification from the photo array and should not assume that the suspect was included. Y.L. signed the form and then identified defendant from the photo array based on his eyes, eyebrows, "lower hairline" and nose. Defendant was then arrested.

¶ 7      On December 6, 2012, Sergeant Alexopoulos, with assistance from other officers, constructed a physical lineup. When choosing fillers, they tried to match "the physical description of the defendant" as close as possible. Sergeant Alexopoulos also explained, however, that because defendant was physically present when the lineup was constructed, the police officers found fillers who they believed looked like defendant, rather than going off of a description. The police tried to match defendant's hairline, height, and weight as he appeared that day to the best of their ability but did not weigh defendant before the lineup. While defendant's driver's license showed he weighed 136 pounds, the lineup sheet showed three fillers were heavier and one filler weighed 185 pounds. No one in the lineup, including defendant, had a short, cropped-style haircut and one man was balding on top. All fillers had dark hair.

¶ 8      Each line up participant wore the same black shirt bearing the number of his place in the lineup. Additionally, the police gave defendant clothes and black boots so he and the other lineup participants would be similarly dressed. No one wore a mask. Furthermore, Sergeant Alexopoulos orally instructed Y.L. and Reilley that the perpetrator may not be in the lineup, and the two witnesses viewed the lineup separately before identifying defendant.

¶ 9    The trial court denied defendant's motion to suppress, finding that all participants but one appeared to be of a similar weight. Additionally, all participants appeared to be of a similar age and had similar hair and complexions. The photo array was "very fair." As for the physical lineup, the men were similarly dressed, and all fillers were good except one. Two were "remarkably good." The court found the lineup was fair as a whole and stated, "you can't get clones for the defendant."[1]

¶ 10                                    B. Trial

¶ 11    At trial, Y.L. testified that after opening Palm Beach Tan at 8 a.m. on the day in question, she went to the back of the salon to apply makeup and fold towels. Upon hearing the door chime, she saw the back of someone entering the conference room. Because a meeting was scheduled for 11 a.m., she believed it was the district manager and continued to fold towels. She then saw defendant quickly approaching with his hand "ready to grab [her]." Despite his face being covered from the bridge of his nose down, Y.L. could see defendant's eyes, eyebrows, hairline, bridge of his nose and some of his ears. He wore a light grass-green hoodie with white lettering; a pair of black, fleece-like pants; and thin black cotton gloves. His hood was pulled over his head, and he was approximately 5'10" tall.

¶ 12    Defendant grabbed Y.L. by her hair and forced her into the laundry room at the back of the salon, shutting the door behind him. With one hand on her hair and one arm across her chest, he walked her toward the laundry machine. He turned her around so that they were face to face. Y.L. focused on defendant's facial features to ascertain his intentions and to remember his appearance. According to Y.L., she observed slightly large eyes that were "low and droopy" and ears that were slightly pointy. His hair was dark brown and cut straight across. Additionally, his

_____

[1]Although Judge Garritt E. Howard presided over the motion to suppress hearing, Judge Jeffrey Warnick presided over the trial.

eyebrows were dark but faint at the ends and the bridge of his nose was "not too big." Y.L. later acknowledged on cross-examination that she had been looking at defendant when describing his eyes in court.

¶ 13    Y.L. testified that defendant pushed her head down and forced her to her knees. He lowered his pants and boxers, revealing a condom on his erect penis, and kept one hand in his pocket, leading Y.L. to believe he had a weapon. Defendant put his penis in Y.L.'s mouth for "[a] couple of very long seconds, maybe in the tens, twenties," but then pulled up his pants. He walked Y.L. down the hallway, with one arm across her chest and the other holding her hair.

¶ 14    Upon observing that a customer had entered the salon, defendant said, "oh shit." While telling the customer to go into a side room, defendant let go of Y.L. The customer responded, "Fuck you." Y.L. then ran next door to Jewel-Osco, where someone called 911. Through the Jewel-Osco's window, she observed defendant leave the salon and walk toward the parking lot. She lost sight of him, however. She did not recall seeing him drive a black SUV or enter a black minivan. After Y.L.'s rape kit was completed at the hospital, a police officer returned her to Palm Beach Tan, where she spoke to detectives. She described the offender as a very skinny Hispanic man, between 18 and 20 years old, with black hair and dark eyes. She also described his hairline and ears. She told police that she had pleaded in Spanish, but the offender did not respond.

¶ 15    The next day, detectives showed Y.L. a photo array. Before doing so, they read her a form stating that the suspect may or may not appear in the photo array and that she was not required to identify anyone. Y.L. signed this form. When Y.L. looked at the photo array, she was "1,000%" sure that defendant was the offender. She recognized him in the photo array because of his "low droopy eyes," although she did not recall whether she had told detectives that the

offender's eyes were droopy. Additionally, she covered the lower half of his face when looking at his photo but did not feel the need to cover the lower half of any other filler's face. At the lineup the following day, the police told Y.L. that the suspect may or may not be present and that she did not need to make an identification. Notwithstanding this admonishment, she identified defendant. During her testimony, she also identified photographs of the pants and boxers defendant wore during the assault.

¶ 16    The parties essentially stipulated that no semen was found on Y.L.'s clothes, that fingernail scrapings and oral swabs did not contain sufficient male DNA for analysis, and that defendant's fingerprints were not found at Palm Beach Tan. Furthermore, forensic scientist Wendy Gruhl testified that she found no semen or male DNA on the oral swabs taken from Y.L.

¶ 17    Reilley testified that when he parked outside Palm Beach Tan on the day in question, he saw a small passenger car and a black SUV in the parking lot. He went inside at about 8 a.m. and saw a tall thin man, who Reilley identified in court as defendant, wearing a hooded, light-green sweatshirt and dark pants. Reilley thought it was strange for the man to be so bundled up given the warm weather. After waiting five minutes for someone to assist him, Reilley saw defendant approach the counter holding a young girl with his left arm. Defendant made eye contact with Reilley and said, "oh shit." The girl said, "help me sir. Please help me." When defendant told Reilley to enter a room, Reilley responded, "Fuck you." After further demands and rebuffs, the girl broke free, fleeing the salon. Defendant walked toward Reilley with his hand in his pocket, leading Reilley to believe that defendant had a weapon. Although defendant wore his hood up and "a scarf or something across his face," Reilley focused on defendant's cold, "lifeless" eyes to predict his next move. Reilley could also see most of defendant's nose.

¶ 18    Reilley backed out of the salon, ran to his truck to get his cell phone, and saw defendant exit the salon. While looking down to retrieve his phone, Reilley lost sight of defendant but the black SUV that had been parked nearby suddenly spun its wheels and took off. Reilley assumed defendant was in the SUV because he could not have been anywhere else, as "everything was wide open for 500 to a thousand feet in every direction." Reilley did not see defendant enter that vehicle, however. Reilley followed the SUV, which left the parking lot and went through a red light. He determined that the SUV's Illinois license plate number contained three or four "ones," but he ultimately lost sight of the SUV. Additionally, Reilley acknowledged he did not actually know the make and model of the vehicle he followed and only knew it was not made by Ford or General Motors. During Reilley's testimony, he identified camera footage of his truck following the vehicle, which Reilley explained he believed to be an SUV "because it's got the lower tailgate and the upper glass. It would be either a car, an SUV or a pickup truck to me."

¶ 19    Upon returning to the salon, Reilley told police the offender was between 20 and 30 years old, skinny, 5'10" or 5'11" tall and possibly Caucasian or Hispanic. Reilley did not recall, however, whether he told the police that the offender had distinct eyes. When Reilley subsequently viewed the lineup, he was "instantly" able to identify defendant because his eyes were etched into Reilley's memory. Reilley also recognized defendant's "body stature." He was the only lineup participant whose size matched the offender and who held himself like the offender. No one else stood out to Reilley. Although Reilley believed that one person in the lineup did not match the description he gave to the police, he had no doubt that defendant was the offender.

¶ 20    Esteban Malapit, a Jewel-Osco employee, testified that at 8:10 a.m. on December 4, 2012, an upset, young woman entered the store and said she had been attacked. Through the

window, Malapit watched a black Honda Odyssey with tinted windows, possibly year 2008, quickly leave the parking lot and ignore stop signs and a red light. Malapit himself owned an Odyssey. While he did not observe a truck following the Odyssey, he did not watch the Odyssey for long.

¶ 21    Sergeant Alexopoulos's testimony was largely consistent with his hearing testimony. He added that Reilley had said the black SUV had tinted windows. Additionally, Malapit had described a black 2008 or 2009 Honda Odyssey with tinted windows. By searching the police database for a black Honda Odyssey with a male driver, Sergeant Alexopoulos found defendant, whose photo and identifiers matched the offender's description. The next day, Y.L. identified defendant from the photo array. She used her hand to cover the lower half of defendant's face but did not do so for the other photo array fillers. Sergeant Alexopoulos acknowledged that defendant was the only individual wearing a green sweatshirt in the photo array but testified that he had attempted to crop the sweatshirt out of the photograph so it would not be suggestive. The photo of defendant was the image for his driver's license. Moreover, Sergeant Alexopoulos acknowledged that Y.L. provided new details about the offender's description after viewing the photo array.

¶ 22    Sergeant Alexopoulos went to defendant's residence, located three or four miles from Palm Beach Tan, and saw a black Honda Odyssey with tinted windows bearing license plate number 13111PT. When defendant was seen driving away in the Odyssey the following day, officers detained him. The next morning, Sergeant Alexopoulos learned defendant's cell phone number. A Motorola cell phone found in the Odyssey rang when Sergeant Alexopoulos dialed defendant's phone number.

¶ 23    Defendant chose his position in the physical lineup, and both Y.L. and Reilley identified him. Sergeant Alexopoulos acknowledged that the lineup contained no skinny Hispanic men and testified that it was difficult to assemble the lineup because he lacked access to a wide variety of people. Additionally, Y.L. identified one of two pairs of boxer shorts defendant was wearing when arrested as having been worn by her assailant. Similarly, Y.L. identified the pants defendant wore during the offense. Conversely, Y.L. stated that several items of clothing recovered from the Odyssey had not been worn by the assailant. Pursuant to a search warrant for defendant's phone, Sergeant Alexopoulos subsequently learned that a text containing the address for Palm Beach Tan had been sent from defendant's phone to defendant's phone on November 25, 2012.

¶ 24    FBI Special Agent Joseph Raschke testified as an expert in historical cell site data, which essentially involved the analysis of cell phone companies' records of phone activity, including which cell towers a phone communicated with. Additionally, Agent Raschke had been asked to determine whether defendant's phone was near Palm Beach Tan at the time of the offense. According to Agent Raschke, no voice activity occurred on defendant's phone between a call at 2:36 a.m. and a call at 8:55 a.m. The latter call used the tower closest to defendant's residence. Text messages received at 7:21 a.m. and 7:22 a.m., however, pinged off the cell tower nearest to the crime scene and on the side of the tower facing the crime scene.

¶ 25    After the State rested, defendant rested without presenting evidence. The jury was instructed, on among other things, aggravated criminal sexual assault based on kidnapping. In contrast to the indictment alleging that defendant committed kidnapping via asportation with the intent to confine Y.L. (see 720 ILCS 5/10-1(a)(2) (West 2012)), the court, without objection, instructed the jury on kidnapping based on actual confinement (see *id.* § 10-1(a)(1)). The jury

found defendant guilty of both of the aforementioned offenses and acquitted defendant of an additional count of aggravated criminal sexual assault predicated on attempted aggravated robbery as well as one count of attempted aggravated robbery. The trial court subsequently denied defendant's posttrial motion and found his kidnapping conviction merged into aggravated criminal sexual assault predicated on kidnapping. The trial court imposed a single 28-year sentenced for that offense.

¶ 26                                    II. Analysis

¶ 27                          A. Photo Array and Lineup

¶ 28    On appeal, defendant first asserts that the trial court erroneously denied his motion to suppress the photo array and lineup identifications because they were impermissibly suggestive.

¶ 29    Evidence of an identification, and any subsequent identification, must be excluded under the due process clause of the fourteenth amendment only where the pretrial encounter resulting in an identification was unnecessarily or impermissibly suggestive so that a very substantial likelihood exists that the offender was irreparably misidentified. *People v. Gabriel*, 398 Ill. App. 3d 332, 348 (2010). Additionally, lineups and photo arrays need not "include near identical or look alikes of the witness's descriptions" (*id.*), although participants should not appear grossly dissimilar to a suspect (*People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 25; see also 725 ILCS 5/107A-2(f)(3)(B) (West 2014) (stating that "[t]he suspected perpetrator shall not be substantially different in appearance from the fillers based on the eyewitness's previous description of the perpetrator or based on other factors that would draw attention to the suspected perpetrator")). Furthermore, " '[i]t is a truism that individual facial features and hair styles and lengths differ, and this makes precise correspondence of all subjects in a photo array [or lineup] a practical impossibility.' " *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 41. Differences between

- 10 -

the size, age, and appearance of a defendant and other lineup participants generally "go to the weight of the evidence, not necessarily its admissibility." *People v. Maloney*, 201 Ill. App. 3d 599, 607 (1990).

¶ 30 Conversely, identification procedures have been found to be suggestive where (1) the identifying witness knew everyone in the lineup but one person, (2) the other lineup participants were grossly dissimilar in appearance to the suspect, (3) "only the suspect was required to wear distinctive clothing which the culprit allegedly wore," (4) the police told the witness that the culprit was in custody and then brought the culprit before the witness alone or showed the witness the culprit in jail, (5) the suspect was pointed out prior to or during a lineup, and (6) the participants were asked to try on an article of clothing which fit only the suspect. *United States v. Wade*, 388 U.S. 218, 233 (1967).

¶ 31 Moreover, the defendant has the burden of proving that a pretrial identification was impermissibly suggestive. *Ortiz*, 2017 IL App (1st) 142559, ¶ 22. The State, however, may rebut a defendant's showing by providing clear and convincing evidence that the witness's identification is based on her independent recollection of the incident. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 95. Courts must examine the totality of circumstances in determining whether an identification violated due process. *Gabriel*, 398 Ill. App. 3d at 348. A trial court's finding that an identification procedure was not unduly suggestive must be upheld unless it is against the manifest weight of the evidence (*Ortiz*, 2017 IL App (1st) 142559, ¶ 21), whereas we review the trial court's ultimate suppression ruling *de novo* (*People v. Faber*, 2012 IL App (1st) 093273, ¶ 50). In affirming the trial court's ruling on a motion to suppress, reviewing courts may consider evidence presented at both the suppression hearing and trial. *People v. Johnson*, 2019 IL App (1st) 161104, ¶ 12.

¶ 32    Here, the trial court's determination that the photo array and lineup were appropriate was not against the manifest weight of the evidence, and the court properly denied defendant's motion to suppress.

¶ 33    Reilley described the offender as either Hispanic or Caucasian, with a light complexion, whereas Y.L. described the offender as being Hispanic. Reilley described him as being 20 to 30 years old, and Y.L. described him as being between 18 years of age and his early twenties. In short, the witnesses described a young adult. Both Reilley and Y.L. described the perpetrator as having dark hair. Additionally, Reilley noticed the perpetrator's thin face, and Y.L. described him as being very thin. Y.L. added that the offender had dark eyes.

¶ 34    After determining that defendant was a suspect, Sergeant Alexopoulos tried to find other fillers for the photo array that looked like defendant. To that end, every witness the police included in the photo array had a short, cropped hairstyle. The record supports the court's finding that the participants had similar hair and complexions and that they seemed to be of a similar age. We further observe that the individuals had similar eye shapes, notwithstanding defendant's argument to the contrary. While one participant seemed to be heavier set, the remaining photo array fillers appeared to be of a similar weight. We disagree with defendant's assertion that he was the only person photographed who could have been "very skinny," as Y.L. described the perpetrator to be. We also observe that defendant ignores Reilley did not state that the perpetrator was *very* skinny.

¶ 35    Defendant nonetheless argues that the photo array was suggestive because defendant was the only photo array participant wearing a green hoodie, similar to the description of the perpetrator. Yet, it is not at all clear from the photo that the green area of the photo is a hoodie, rather than part of the background or mere discoloration. While the area is green, we also

question whether it could be fairly characterized as "grass green," the color reportedly worn by the perpetrator. Moreover, the police did not make defendant wear a green hoodie for the photograph, and defendant has failed to cite to a page of the record supporting his assertion that the police had access to other photographs of defendant in which he was not wearing a green hoodie. Even if it was clear that defendant was photographed in a green hoodie, this alone did not render the photo array suggestive, particularly considering that Sergeant Alexopoulos advised Y.L. that the perpetrator might not be pictured. The record supports the trial court's finding that the photo array was "very fair." See *Faber*, 2012 IL App (1st) 093273, ¶¶ 55-57 (finding that the lineup was not unduly suggestive where the defendant was the only person shown both in the photo array and the lineup, the defendant was the only person wearing clothing described by the witnesses, and his muscular physique stood out); *Gabriel*, 398 Ill. App. 3d at 348 (finding that "[w]hile the men had on different colored shirts or had lighter facial hair, these factors are relevant only within the context of the totality of circumstances," and the participants shared many similar features).

¶ 36    Sergeant Alexopoulos also testified that when choosing fillers for the lineup, the police were not limited to the witnesses' description and sought out fillers who looked like defendant. Specifically, the police tried to match defendant's hairline, height, and weight by just looking at him. As the trial court found, the lineup participants were similarly dressed. While defendant argues that the fillers' actual weight varied significantly from defendant's actual weight, that was not obvious from the loose-fitted black T-shirts the participants were given to wear. Additionally, Sergeant Alexopoulos acknowledged that none of the fillers had a short, cropped haircut but testified that defendant did not have one either. Thus, this would not have made the lineup suggestive. *Cf. Maloney*, 201 Ill. App. 3d at 606-07 (finding the lineup procedure was

unnecessarily suggestive where (1) the defendant was unkempt and disheveled while other participants were well dressed and well groomed, (2) the defendant's weight differed from other participants, (3) the differences in appearance were extreme, and (4) the police "all but hung a sign saying 'pick me' around defendant's neck"). Moreover, Sergeant Alexopoulos advised Y.L. and Reilley that the perpetrator may not be in the lineup.

¶ 37     Defendant further contends that he was the only lineup participant who looked Hispanic. Indeed, both Reilley and Y.L., who we note identifies as being Puerto Rican, testified that they still thought defendant could be Hispanic upon seeing him in court. Yet, based on the lineup photographs included in our record on appeal, we see no basis for defendant's bald assertion that the other lineup fillers unequivocally did not look Hispanic. See also *Joiner*, 2018 IL App (1st) 150343, ¶ 41 (stating that "[w]hile defendant's skin tone appears to be darker than the other four individuals, it is not extraordinarily so"). Additionally, defendant ignores that Reilley said the perpetrator could be Caucasian rather than Hispanic. Defendant's contention is particularly disingenuous considering that defendant has never identified himself Hispanic. We note that the presentence investigation report states that defendant was born in Tripoli, Lebanon. *Cf. Corral*, 2019 IL App (1st) 171501, ¶¶ 5, 98 (finding, where the defendant was only one of three lineup participants who matched the witness's description of a " 'younger male Hispanic,' " and where a fourth lineup participant was 30 years old and heavyset, that the lineup procedure was not suggestive).

¶ 38     Moreover, defendant makes too much of Reilley's testimony about body statute. After Reilley testified that one filler did not match the characteristics Reilley described for the police, the following colloquy ensued:

        "Q. Did you even have to give that guy a [second] look?

A. No. I didn't give really any of them a second look. I started at the left, I scanned across, I picked out the body stature and *when I made contact with his eyes, I knew it.*

Q. And you stated that you made a look to see the body stature of the individuals that were inside the lineup; is that correct?

A. Right.

Q. And with respect to the body statures, the only person's body stature that matched what you saw inside of that tanning salon was Mr. Ayoubi, correct?

A. That's correct.

Q. The other individuals didn't match the body characteristics of whom you saw inside the tanning salon, correct?

A. In my opinion, that's correct." (Emphasis added.)

We categorically reject defendant's assertion that this shows defendant's height and weight was the basis for identifying defendant and, thus, the difference between defendant's stature and the fillers' stature led Reilley to misidentify defendant. On the contrary, this testimony showed only that Reilley's confidence in identifying defendant made it obvious to him that the others were not a match. Furthermore, Reilley clearly testified that defendant's eyes, not his stature, made Reilley certain.

¶ 39    Here, the trial court found that two fillers were good and two were "remarkably good." Although one filler was heavier, older, and balding, the record supports the court's finding that, as a whole, the lineup was fair.

¶ 40                                B. Kidnapping

¶ 41  Defendant raises two challenges pertaining to the predicate kidnapping offense underlying the aggravated criminal sexual assault conviction. Section 10-1(a) of the Criminal Code of 2012 recognizes three forms of kidnapping:

> "(a) A person commits the offense of kidnapping when he or she knowingly:
>
> (1) and secretly confines another against his or her will;
>
> (2) by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will; or
>
> (3) by deceit or enticement induces another to go from one place to another with intent secretly to confine that other person against his or her will."
>
> 720 ILCS 5/10-1(a) (West 2012).

Thus, a defendant can commit kidnapping by confinement, asportation, or inducement. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 42  Here, defendant was indicted for aggravated criminal sexual assault based on kidnapping and kidnapping based on asportation with the intent to confine (720 ILCS 5/10-1(a)(2) (West 2012)). While the jury was instructed on aggravated criminal assault based on kidnapping, the kidnapping instruction was based on actual confinement (*id.* § 10-1(a)(1)), not asportation with the intent to confine as alleged in the indictment. This distinction informs our consideration of both kidnapping related contentions.

¶ 43                                    i. Sufficiency of the Evidence

¶ 44  Defendant contends on appeal that the evidence was insufficient to sustain his conviction for aggravated criminal sexual assault predicated on kidnapping because confinement and asportation were inherent in the sexual assault of Y.L. While the jury was not asked to consider asportation, we find the evidence was sufficient to establish both forms of kidnapping. See also

*People v. Maxwell*, 148 Ill. 2d 116, 137-38 (1992) (stating that Illinois law recognizes a single murder offense, "which may be committed in a variety of ways," that the method of the murder need not be specified in the indictment, and that no reversible error occurred where the defendant was charged under two methods and the evidence supported the court's decision to submit an instruction on a third method).

¶ 45      The State has the burden of proving each element of an offense beyond a reasonable doubt. *Siguenza-Brito*, 235 Ill. 2d at 224. In reviewing the sufficiency of the evidence, we must determine whether, considering all evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *Id.*[2]

¶ 46      Under the *Levy-Lombardi* doctrine (see *People v. Levy*, 204 N.E.2d 842 (N.Y. 1965); *People v. Lombardi*, 229 N.E.2d 206 (N.Y. 1967)), a defendant cannot be convicted of kidnapping if asportation or confinement of the victim was incidental to another crime. *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 24. This is because "there is an inequity inherent in permitting kidnapping prosecutions of those who, in reality, committed lesser or different offenses, of which temporary seizure, asportation, or detention played an incidental part." *People v. Smith*, 91 Ill. App. 3d 523, 528 (1980). To determine whether asportation or confinement is merely ancillary to another offense, courts consider (1) the duration of asportation or confinement; (2) whether asportation or confinement occurred during a separate offense; (3) whether asportation or confinement is inherent in that separate offense; and (4) whether asportation or confinement created a significant danger independent of the danger posed by the

---

[2]To the extent defendant's reply brief attempts for the first time to analogize sentencing jurisprudence to his claim that the evidence was insufficient, we find this contention is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (stating that "[p]oints not argued are forfeited and shall not be raised in the reply brief").

separate offense. *Siguenza-Brito*, 235 Ill. 2d at 225-26. Whether asportation or confinement constitutes kidnapping depends on the specific facts and circumstances of a case. *People v. Ware*, 323 Ill. App. 3d 47, 54 (2001).

¶ 47    As to duration, defendant moved Y.L. only a short distance into the laundry room. Yet, this does not alone preclude a kidnapping conviction. *Siguenza-Brito*, 235 Ill. 2d at 226. The period of confinement was similarly brief, but a jury could find this brevity was only on account of defendant discovering Reilley's presence in the salon. To the extent defendant suggests that Y.L. was not secretly confined at all where defendant did not lock the door to the salon, disable the door chimes, lock the laundry room door, or turn off the light, defendant clearly confined her when he closed the laundry room door, particularly where he gave the appearance of having a weapon. He had no need to lock the door to prevent Y.L. from leaving.

¶ 48    The second factor is satisfied when the asportation or confinement occurred before, rather than during, the sexual assault. See *id*; *Johnson*, 2015 IL App (1st) 123249, ¶ 24; *People v. Lloyd*, 277 Ill. App. 3d 154, 164 (1995). Here, rather than confining Y.L. where she stood, he moved her to another room and confined her by closing the door prior to the assault.

¶ 49    Furthermore, neither the asportation nor means of confinement that occurred here were inherent in the offense or necessary to accomplish the assault. See *People v. Thomas*, 163 Ill. App. 3d 670, 678 (1987); see also *Lloyd*, 277 Ill. App. 3d at 164 (stating that forced movement of the victim is not inherent in criminal sexual assault). He could have accomplished the act when and where he first encountered Y.L. *Cf. People v. Young*, 115 Ill. App. 3d 455, 469-70 (1983) (finding that the defendant's act of grabbing the victim and throwing her against the wall was insufficient to sustain kidnapping as a prerequisite to aggravated kidnapping where the detention marked the beginning of the struggle culminating in rape, was only long enough to

accomplish the rape, and was inherent in the rape itself because the victim had to be restrained to accomplish the rape).

¶ 50    Finally, both the asportation and confinement created a significant danger independent of that posed by the sexual assault. Defendant manhandled Y.L. during asportation, grabbing her by her hair and placing his arm across her chest. This created an independent risk of injury. Additionally, it is well-settled that the privacy of a final destination poses a significant danger independent of that created by criminal sexual assault. *Siguenza-Brito*, 235 Ill. 2d at 226; *Ware*, 323 Ill. App. 3d at 56 (finding the difficulty in signaling for help and the diminished likelihood that a passerby would observe the victim constituted an independent danger). Here, the evidence was sufficient to demonstrate that the asportation and confinement of Y.L. were not merely incidental to the sexual assault.

¶ 51                                  ii. Jury Instructions

¶ 52    Defendant also asserts that error occurred where the kidnapping instruction tendered to the jury was based on actual confinement but the indictment alleged kidnapping by asportation with the intent to secretly confine. Specifically, defendant contends that the jury instructions were "erroneous and contradictory" and affected his conviction for aggravated criminal sexual assault predicated on kidnapping. Defendant failed to preserve this issue but urges us to review it as plain error. The plain error doctrine permits a reviewing court to consider a forfeited error affecting substantial rights where either (1) the evidence is closely balanced, making it possible that the guilty verdict resulted from the forfeited error, or (2) the error is so serious as to deny the defendant a substantial right and, consequently, a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Courts must first determine whether clear or obvious error occurred. *People v. Radford*, 2020 IL 123975, ¶ 24.

¶ 53    Jury instructions are intended to convey the correct, applicable legal principles so that the jury may arrive at a correct conclusion under the law and the evidence. *People v. Robinson*, 2016 IL App (1st) 130484, ¶ 40. Additionally, a trial court must instruct the jury as to the offense's elements. *Id.* Providing conflicting jury instructions on an essential element constitutes prejudicial error. *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977). We review *de novo* whether jury instructions accurately conveyed the law, but we review the trial court's decision to give a particular instruction for an abuse of discretion. *People v. Dorn*, 378 Ill. App. 3d 693, 698 (2008).

¶ 54    Here, the jury was instructed that "[a] person commits the offense of aggravated criminal sexual assault when he commits criminal sexual assault and the criminal sexual assault is perpetuated [*sic*] during the course of the commission of the offense of kidnapping." See Illinois Pattern Jury Instructions, Criminal, No. 11.57(a)(4) (4th ed. 2000) (hereinafter IPI Criminal 4th). Additionally, the jury was instructed that "[a] person commits the offense of kidnapping when he knowingly and secretly confines another person against their will." See IPI Criminal 4th No. 8.01. Furthermore, "[t]o sustain the charge of kidnapping, the State must prove the following propositions: First proposition, that the defendant acted knowingly; and, second proposition, that the defendant secretly confined [Y.L.] against her will." See IPI Criminal 4th No. 8.02. These are accurate statements of law that set forth the complete elements of an offense recognized in this state. See 720 ILCS 5/10-1(a)(1) (West 2012). Moreover, because the jury was not instructed on any other form of kidnapping, there can be no contradiction in the instructions. According to defendant, "[w]hile the instructions given were technically legally correct IPI instructions, the jury was not accurately instructed on the law as it related to the offense charged in the indictment."

¶ 55 We question whether defendant's assertion would be more accurately characterized as a challenge to the charging instrument. "A criminal defendant has a fundamental right to be informed of the nature and cause of criminal accusations made against him." *People v. Carey*, 2018 IL 121371, ¶ 20; see also 725 ILCS 5/111-3 (West 2012). This applies to the predicate offense of the crime charged and protects the defendant against being required to speculate as to the elements or nature of the underlying offense. *Carey*, 2018 IL 121371, ¶ 20. Here, defendant's purported challenge to the jury instructions essentially asserts that the jury was instructed, and he was found guilty of an offense that could not be discerned from the charging instrument.

¶ 56 In any event, defendant relies heavily on *Robinson*. There, the defendant was charged, in pertinent part, with kidnapping and aggravated kidnapping in that he knowingly, by deceit or enticement, induced the victim "to go from one place to another with intent secretly to confine her against her will.' " *Robinson*, 2016 IL App (1st) 130484, ¶ 3. The defendant argued on appeal that the jury was given erroneous, contradictory instructions on kidnapping and aggravated kidnapping because "the aggravated kidnapping instruction was predicated on a confinement theory, but the charges in the indictment *and the kidnapping instruction* were predicated on an inducement theory." (Emphasis added.) *Id.* ¶ 37. The State agreed that the aggravated kidnapping instruction was improper because the indictment was based on inducement but argued that the variance between the instructions and indictment did not require reversal because the jury instructions did not misstate the law, prejudice the defendant, or expose him to double jeopardy. *Id.* ¶¶ 43-44.

¶ 57 The reviewing court found that the aggravated kidnapping instruction based on actual confinement omitted an element of the offense, specifically, that defendant induced the victim to go from one place to another by deceit or enticement with the intent to secretly confine her. *Id.*

¶ 43. Not only did the aggravated kidnapping instruction on actual confinement not align with the charges, but it did not align with the evidence or the parties' arguments. *Id.* ¶ 51. Additionally, the instructions presented a discrepancy "between two statutory subdivisions of the same offense, *i.e.*, aggravated kidnapping predicated on actual confinement or deceit and enticement." *Id.* "Although the aggravated kidnapping instruction was a legally correct IPI instruction, it did not accurately state the law as related to the charged offense in this case." *Id.* ¶ 52. Finally, the reviewing court found second-prong plain error occurred because there was a serious risk that the jury erroneously convicted the defendant due to a misunderstanding of applicable law. *Id.* ¶¶ 46, 54.

¶ 58    To the extent that the *Robinson* jury was actually instructed on multiple forms of kidnapping, it is clearly distinguishable from the present case. Additionally, the jury in *Robinson* was instructed on a form of kidnapping, actual confinement, that was not supported by the evidence or the arguments. In contrast, here, the evidence and arguments addressed both asportation and actual confinement. Indeed, defendant concedes that "the State argued that the kidnapping charge was established under the theory of 'actual secret confinement.' " See also *Maxwell*, 148 Ill. 2d at 137-38 (stating that the method of the murder need not be specified in the indictment, and that no reversible error occurred where the defendant was charged under two methods and the evidence supported the court's decision to submit an instruction on a third method). Furthermore, neither asportation, confinement, nor intent to confine were truly at issue. Rather, defense counsel focused on identification. While we question whether *Robinson*'s discussion of the variance between the indictment and the instruction may have been better characterized as an attack on the sufficiency of the indictment rather than as an attack on an inaccurate instruction, that distinction would not ultimately affect the outcome here.

¶ 59     Errors in giving or refusing to give instructions do not always justify reversal if the evidence of the defendant's guilt is so clear and convincing as to preclude a reasonable jury from acquitting the defendant. *People v. Jones*, 81 Ill. 2d 1, 9 (1979). Even an instruction that is erroneous as to an element of an offense does not automatically constitute reversible error under the second prong of plain error analysis. *People v. Carter*, 405 Ill. App. 3d 246, 252, 254 (2010). Additionally, when a defendant attacks a charging instrument for the first time on appeal, the instrument "is sufficient if it notified the defendant of the precise offense charged with enough specificity to allow the defendant to (1) prepare his or her defense and (2) plead a resulting conviction as a bar to future prosecution arising out of the same conduct." *Carey*, 2018 IL 121371, ¶ 22.

¶ 60     Here, the evidence was not closely balanced. Two eyewitnesses confidently identified defendant as the perpetrator. Texts messages from defendant's phone to defendant's phone before the incident set forth the address of the crime scene. Additionally, defendant's phone pinged off the tower nearest to the crime scene shortly before the crime. Furthermore, Y.L.'s uncontradicted testimony showed that defendant not only moved her with the intent to confine her but actually did confine her. The lack of physical evidence at the crime scene does little to undermine the strength of the State's case.

¶ 61     Moreover, any error that occurred here was not so serious as to deny defendant a substantial right or a fair trial. Beginning with opening statements, defendant and the jury were made aware of the State's theory that defendant actually confined Y.L. Defendant concedes that the prosecutor also homed in on actual confinement while questioning Y.L. and in making closing arguments. There was simply no confusion here. As stated, defense counsel primarily focused on the identification of the perpetrator, not whether Y.L. was confined or whether

defendant intended to confine her. Compare *People v. Rexroad*, 2013 IL App (4th) 110981, ¶ 24 (finding the erroneous instruction on intent as to indecent solicitation of a child was not second-prong plain error where the issue at trial was identity), with *People v. Ogunsola*, 87 Ill. 2d 216, 221-23 (1981) (finding plain error where jury instructions omitted the intent element of deceptive practices, and "[t]he principal contested issue relevant to defendant's culpability was whether he had the intent to defraud").

¶ 62    Defendant has not identified what defense counsel would have done differently had the indictment referred to actual confinement or had the State only argued asportation with the intent to confine Y.L. See *Carey*, 2018 IL 121371, ¶ 30 (noting that the defendant had not identified what actions he could have taken had the indictment been different). Additionally, defendant overlooks that his attorney may have strategically agreed to have the jury instructed on actual confinement as opposed to asportation with the intent to confine because he believed it improved his chances, however slim, of achieving an acquittal. See IPI Criminal 4th No. 8.02, Committee Note (stating that "intent to confine is not an issue when the evidence tends to show that the defendant did confine the victim"). To be clear, however, no reasonable jury could have found that defendant did not, by force or imminent threat thereof, move Y.L. from one place to the other with the intent to secretly confine her. See *People v. Eddington*, 117 Ill. App. 3d 953, 962 (1983) (finding any error in jury instructions as to kidnapping was harmless where evidence of guilt was overwhelming). We find that plain error did not occur here.

¶ 63                                   C. Closing Arguments

¶ 64    Defendant further asserts the prosecutor improperly bolstered the eyewitnesses' credibility during closing argument. Yet, defendant failed to preserve this issue and cannot establish plain error.

¶ 65    The trial court has discretion over the style and substance of closing argument. *People v. Meeks*, 382 Ill. App. 3d 81, 84 (2008); see also *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 37 (recognizing a conflict between whether improper remarks should be reviewed under the *de novo* or abuse of discretion standard). Additionally, prosecutors are generally afforded considerable latitude during closing and rebuttal arguments. *People v. Shief*, 312 Ill. App. 3d 673, 677 (2000). The prosecutor may comment on characterizations of the evidence made by the defense. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). The prosecutor cannot comment on a witness's credibility, however, unless the comment is based on fair inferences made from the evidence. *Shief*, 312 Ill. App. 3d at 678. Furthermore, a prosecutor may not suggest that evidence of guilt exists but will not be heard by the jury because it is inadmissible. *Id.* at 679. That being said, a defendant cannot complain that the prosecutor's remark denied him a fair trial where defense counsel provoked a response. *Evans*, 209 Ill. 2d at 225. In reviewing allegations of prosecutorial misconduct, courts examine arguments made by the prosecutor and the defense in their entirety and place comments in their proper context. *Meeks*, 382 Ill. App. 3d at 84.

¶ 66    During closing argument, defense counsel relied heavily on omissions from the police reports. Counsel argued that while Sergeant Alexopoulos testified he believed Reilley had told him there were "ones" in the license plate of the car he followed, Sergeant Alexopoulos had not included that in his general progress report (GPR). Counsel added:

> "The black SUV turns into a black Honda Odyssey, turns into a black Honda Odyssey that has a bunch of '1s' in there. And a bunch of '1s' that come in there we have no idea where they came from.
>
> The police introduced in this case a black Honda Odyssey. He said so much in the way he created that report. The report is generated talking about one thing and then

December 9th, he does the supplemental report. He's the lead detective on this case and he wants to tell you about what is possibly heard or written down by the person that he's training? You didn't hear from that person, did you? You never heard anything about that person talking to Mr. [Reilley] and Mr. [Reilley] putting down a bunch of '1s.' "

¶ 67 In response, the State addressed defense counsel's challenge to the credibility of Reilley's testimony that there were multiple "ones" in the license plate:

"And counsel's arguing about the report and the reports. These reports are summaries. *If they were evidence, which they're not,* I would come to you and hand each one of you a set of all of the police reports and I'd say, read this and make your determination. *I don't do that because police reports aren't evidence.* You don't get them in the back. You're not shown them. You're not going to get them in the back so counsel can argue about police reports all he wants *but that's not the evidence.*

The evidence is what you heard from the stand. The evidence is what you heard from the witnesses." (Emphases added.)

¶ 68 Defendant argues that with these comments the prosecutor bolstered the witnesses' credibility, told the jurors to disregard the police reports as well as defense counsel's use of those reports, and thereby created substantial prejudice. Defendant concludes that those "remarks played a significant factor" in defendant's conviction because the conviction rested greatly on eyewitness credibility.

¶ 69 First, we find defense counsel invited a response by emphasizing the report's omission of Reilley's reference to "ones." The prosecutor's response did not constitute improper bolstering of Reilley's credibility. In this context, we are also at a loss to see how this could have conceivably bolstered Y.L.'s credibility, as defendant suggests. Additionally, while the

prosecutor told jurors to disregard the reports themselves, the prosecutor did not tell jurors to disregard testimony about the reports. Indeed, the prosecutor told jurors to consider the witnesses' testimony. Furthermore, the prosecutor's comments were entirely consistent with the well-settled rule that police reports can be used for impeachment, rather than as substantive evidence, but that they are only summaries. See *People v. Sutton*, 260 Ill. App. 3d 949, 961 (1994) (finding the argument that reports are not "evidence" but only summaries correctly represented that police reports could be used for impeachment, not as substantive evidence, and that the prosecutor's statements properly responded to defense counsel's impeachment of police testimony by noting omissions from police reports).

¶ 70    Defendant's reliance on *Shief* is misplaced. There, the prosecutor argued:

" 'Let's talk about something because there is something [defense counsel] talked about that we didn't show. Let's talk about police reports. Guess how many police reports you're going to get with you when you go back to that jury room?

* * *

You're not getting any. You know why[?]

* * *

They're not evidence. You see if I had my way, I would hand you all these police reports and say you go back in there and say he's guilty[.]' " *Shief*, 312 Ill. App. 3d at 677-78.

¶ 71    The reviewing court found these statements improperly inferred that defense counsel intentionally kept reports from the jury and that the reports "contained information that would have unequivocally established defendant's guilt and made a trial unnecessary." *Id.* at 679-80.

Additionally, the prosecutor's statements were not invited by defense counsel's comments about the police reports. *Id.*

¶ 72    Unlike *Shief*, the prosecutor's comments here did not insinuate that police reports would unequivocally demonstrate that defendant was guilty. Instead, the prosecutor insinuated, if anything, that the police reports had limited value. Additionally, the prosecutor emphasized the importance of evidence, rather than diminishing the necessity of trial. We also reiterate our finding that defense counsel's comments invited the prosecutor's remarks.

¶ 73    Even assuming error occurred, it would not amount to plain error or reversible error. We reiterate that the evidence was not closely balanced. Defendant's conviction did not rest solely on the victim's identification but rested on the identification made by a second witness as well as defendant's text messages containing the crime scene address and evidence that he was in the vicinity shortly before the crime. *Cf. id.* at 680 (finding that the prosecutor's remarks required reversal where the evidence was not overwhelming and the State's case rested primarily on the credibility of, and identification made by, the victim); see also *Evans*, 209 Ill. 2d at 224-25 (finding that "[w]hile the prosecutor's comments were ill-advised," they were not reversible error). The result would not have been different here absent the challenged remarks. Furthermore, error in closing argument generally does not fall into the type of error recognized as structural. *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 78. Defendant has not shown that the comments precluded his right to a fair trial.

¶ 74                                   D. Historical Cell Site Data

¶ 75    Finally, defendant asserts that the historical cell site data and Agent Raschke's testimony regarding such data should have been excluded because it was obtained without a search warrant. See *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2221 (2018) (holding that

the government generally must obtain a warrant supported by probable cause before acquiring cell-site location information). Defendant acknowledges that he failed to preserve this issue but concludes that "[t]rial counsel's failure to file a motion to suppress or object to Agent Raschke's testimony on this basis constituted plain error, warranting reversal and remand for a new trial."

¶ 76    Ineffective assistance of counsel claims overlap with claims of plain error because a successful claim that counsel was ineffective would necessarily establish second-prong plain error. *People v. Wood*, 2014 IL App (1st) 121408, ¶ 56. Ineffective assistance of counsel claims, however, require the defendant to show that counsel's performance was deficient and that this deficiency resulted in prejudice. *People v. Snowden*, 2011 IL App (1st) 092117, ¶ 69. More specifically, defendant in this instance must show he was prejudiced in that a motion to suppress would have been granted and the outcome of trial would have been different as a result of that suppression. See *id.*

¶ 77    Even if Agent Raschke had not testified about the historical cell site data placing defendant in the vicinity of the assault, the result would not have been different where two eyewitnesses independently identified defendant as the perpetrator and defendant's text messages, retrieved via a search warrant, included the salon's address. Thus, defendant cannot establish prejudice necessary to show that counsel was ineffective, and defendant cannot rely on the ineffective assistance of counsel to establish second-prong plain error. Moreover, defendant has not identified any other manner in which this amounted to plain error.

¶ 78                                    III. Conclusion

¶ 79    For the foregoing reasons, we find that the trial court properly declined to suppress the photo array and lineup identifications. Additionally, the evidence was sufficient to establish that defendant kidnaped Y.L. as a predicate offense to aggravated criminal sexual assault.

Furthermore, defendant has not demonstrated that reversible error occurred with respect to the jury instructions, closing arguments, or the admission of testimony on historical cell site data. Accordingly, we affirm the trial court's judgment in its entirety.

¶ 80    Affirmed.

---

**No. 1-18-0518**

---

| | |
|---|---|
| **Cite as:** | *People v. Ayoubi*, 2020 IL App (1st) 180518 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-0015301; the Hon. Garrit E. Howard and the Hon. Jeffrey Warnick, Judges, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Jodi L. Garvey, of Blegen & Garvey, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Tyler D. Michals, Assistant State's Attorneys, of counsel), for the People. |

---