2025 IL App (1st) 240783-U

No. 1-24-0783

Order filed October 14, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2013 CR 0015301 |
| | ) | |
| FIRAS AYOUBI, | ) | The Honorable |
| | ) | Paul S. Pavlus, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's denial of defendant's motion for forensic testing is affirmed where defendant failed to establish that forensic DNA testing of hair found on the victim's shirt could produce new, noncumulative evidence materially relevant to his claim of actual innocence.

¶ 2    Following a jury trial, defendant Firas Ayoubi was found guilty of aggravated criminal sexual assault predicated on kidnapping and sentenced to 28 years in prison. Defendant appeals from the circuit court's denial of his *pro se* motion for forensic DNA testing pursuant to section

116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2020)) of hair recovered from the victim's shirt. On appeal, defendant argues that the circuit court erred in denying his motion as he established a *prima facie* case for forensic DNA testing and the results of such testing would materially advance his claim of actual innocence. We affirm.

¶ 3    The facts of this case have been detailed in our opinion on direct appeal. See *People v. Ayoubi*, 2020 IL App (1st) 180518. We now relate only the facts necessary to decide this appeal.

¶ 4    At trial, the victim, Y.L., testified that she entered and opened Palm Beach Tan for business at 8 a.m. on December 4, 2012. Shortly after opening, she saw a person, who she identified in court as defendant, quickly approaching with his gloved hand "ready to grab [her]." Defendant's face was covered from the bridge of his nose down, but Y.L. could see defendant's eyes, eyebrows, hairline, bridge of his nose, and some of his ears.

¶ 5    Defendant grabbed Y.L. by her hair and forced her into the laundry room at the back of the salon. He turned her around so that they were face to face. Y.L. focused on his facial features to remember his appearance. She observed slightly large eyes that were "low and droopy" and slightly pointy ears. Defendant's hair was dark brown and cut straight across. Additionally, his eyebrows were dark but faint at the ends and the bridge of his nose was "not too big." Defendant wore a light grass-green hoodie with the hood pulled over his head and black, fleece-like pants. Both of his hands were gloved. He was approximately 5'10" tall.

¶ 6    Defendant pushed Y.L.'s head down and forced her to her knees. He lowered his pants and boxer shorts, revealing a condom on his erect penis. Defendant put his penis in Y.L.'s mouth for "[a] couple of very long seconds, maybe in the tens, twenties," and then pulled up his pants. He walked Y.L. down the hallway, where they encountered a customer, later identified as Joseph

Reilley. Defendant let go of Y.L., who ran next door to Jewel-Osco, where someone called 911. Through the store's window, Y.L. saw defendant walk out of the salon toward the parking lot, but lost sight of him.

¶ 7      After Y.L.'s rape kit was completed at the hospital, a police officer returned her to Palm Beach Tan, where she spoke to detectives. She described the offender as a very skinny Hispanic man, between 18 and 20 years old, with black hair and dark eyes. She also described his hairline and ears.

¶ 8      The next day, detectives showed Y.L. a photo array. When Y.L. looked at the photo array, she was "1,000%" sure that defendant was the offender. She recognized him in the photo array because of his "low droopy eyes." At the physical lineup the following day, she identified defendant. She also identified photographs of the pants and boxer shorts defendant wore during the assault.

¶ 9      Reilley testified that when he parked outside Palm Beach Tan on the day of the incident, he saw a small passenger vehicle and a black SUV in the parking lot. He went inside at about 8 a.m. and saw a taller, thin man, who Reilley identified in court as defendant, wearing dark pants and a hooded, light-green sweatshirt. After waiting five minutes for someone to help him, Reilley saw defendant approach the counter holding a young girl, who said "please help me." After a brief exchange, Y.L. broke free, fleeing the salon. Although defendant wore his hood up and "a scarf or something across his face," Reilley focused on defendant's eyes and nose.

¶ 10     Reilley backed out of the salon, ran to his vehicle to get his cell phone, and saw defendant exit the salon. While looking down to retrieve his phone, Reilley lost sight of defendant, but the black SUV that had been parked nearby spun its wheels and "just took off." Reilley followed the

SUV, which left the parking lot and ran a red light. He determined that the SUV's Illinois license plate number contained three or four "ones," but he ultimately lost sight of the SUV.

¶ 11     Upon returning to the salon, Reilley told police the offender was between 20 and 30 years old, skinny, 5'10" or 5'11" tall, and possibly Caucasian or Hispanic. When Reilley subsequently viewed a physical lineup, he was "instantly" able to identify defendant because his eyes were etched in his mind. He also recognized defendant's "body stature." Reilley had no doubt that defendant was the offender.

¶ 12     Esteban Malapit, a Jewel-Osco employee, testified that at 8:10 a.m. on December 4, 2012, an upset, young woman entered the store and said she had been attacked. Malapit looked through the front window and saw a black Honda Odyssey with tinted windows quickly leave the parking lot, ignoring stop signs and a red light.

¶ 13     Chicago Police Department Sergeant George Alexopoulos testified that he searched the police database for a black Honda Odyssey with a male driver. The search returned defendant, whose photo and identifiers matched the offender's description. Sergeant Alexopoulos went to defendant's residence, located three or four miles from Palm Beach Tan, and saw a black Honda Odyssey with tinted windows bearing license plate number 13111PT. When defendant drove the vehicle the following day, officers detained him.

¶ 14     The next morning, Alexopoulos learned defendant's cell phone number. Pursuant to a search warrant for defendant's phone, Alexopoulos then learned that a text containing the address for Palm Beach Tan had been sent and received by defendant's phone on November 25, 2012.

¶ 15     Federal Bureau of Investigation (FBI) Special Agent Joseph Raschke testified as an expert in historical cell site data, which involved the analysis of cell phone companies' records of phone

activity, including records of which cell towers a phone communicated with. Raschke was asked to determine whether defendant's phone was near Palm Beach Tan at the time of the offense. According to Raschke, text messages received at 7:21 a.m. and 7:22 a.m. pinged off the cell tower nearest to the crime scene and on the side of the tower facing the crime scene. A phone call at 8:55 a.m. used the tower nearest to defendant's residence.

¶ 16    The parties stipulated that no semen was found on Y.L.'s clothes or via rape kit testing, that fingernail scrapings and oral swabs did not contain sufficient male DNA for analysis, that Caucasian hairs found on Y.L.'s shirt were suitable for testing, and that defendant's fingerprints were not found at Palm Beach Tan.

¶ 17    On July 14, 2016, the jury found defendant guilty of aggravated criminal sexual assault based on kidnapping (720 ILCS 5/11-1.30(a)(4) (West 2012)) and kidnapping based on actual confinement (720 ILCS 5/10-1(a)(1) (West 2012)) and acquitted defendant of counts of attempted aggravated robbery and aggravated criminal sexual assault predicated on attempted aggravated robbery.

¶ 18    The trial court merged the kidnapping count into the aggravated criminal sexual assault predicated on kidnapping count and sentenced defendant to 28 years in prison.

¶ 19    Defendant appealed, and we affirmed over his contentions, *inter alia*, that the pretrial identifications were impermissibly suggestive and the evidence was insufficient to establish the predicate kidnapping offense. *Ayoubi*, 2020 IL App (1st) 180518.

¶ 20    On November 16, 2020, defendant filed *pro se* the instant motion requesting forensic testing of a pair of boxer shorts, a palm print recovered from the door of the tanning salon, and,

relevant here, "hair not belonging to the victim *** recovered from her work uniform." He contended that the hair could have come from the offender.

¶ 21    The State moved to dismiss and deny the motion, contending that the requested testing would not materially advance defendant's claim of actual innocence. The State argued absence of defendant's hair on the victim's shirt would not show that he did not commit the assault, and another individual's hair could have come from innocent contact with any number of people. Defendant filed *pro se* a response, asserting that the Caucasian hair on Y.L.'s shirt not matching his hair was relevant and material because Y.L. encountered no customers before the incident happened at 8 a.m.

¶ 22    The trial court denied defendant's motion for forensic testing. The court reasoned that the requested testing would not make a material change in the outcome of the case given the "overwhelming two identifications of two separate witnesses."

¶ 23    On appeal, defendant argues that the circuit court erred in denying his motion for forensic DNA testing of the hair pursuant to section 116-3 of the Code. Defendant asserts that he established a *prima facie* case for forensic DNA testing, and that the results of the testing would reveal the true perpetrator, materially advancing his long-standing claim of actual innocence.

¶ 24    Section 116-3 of the Code, in relevant part, permits a defendant to move for forensic DNA testing "on evidence that was secured in relation to the trial *** which resulted in his or her conviction," and "was not subject to the testing which is now requested at the time of trial." 725 ILCS 5/116-3(a)(1) (West 2020). To obtain forensic testing, a defendant must first present a *prima facie* case showing that (1) identity was an issue at trial and (2) a proper chain of custody exists and is sufficient to establish that the evidence to be tested "has not been substituted, tampered with,

replaced, or altered in any material aspect." *Id.* §§ 116-3(b)(1), (b)(2). Identity is an issue when a defendant establishes that, at trial, his or her identity was in question. *People v. Cocroft*, 2020 IL App (1st) 180056, ¶ 21. As to the chain of custody, "a defendant may rely on conclusions and presumptions in his or her petition because the evidence sought to be tested will almost surely have been within the State's safekeeping rather than the defendant's." *Id.*

¶ 25    If a *prima facie* case is established, the court must then determine if (1) the result of the testing has the "potential to produce new, noncumulative evidence *** materially relevant to the defendant's assertion of actual innocence" even where the results would not completely exonerate the defendant, and (2) "the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3(c)(1), (c)(2) (West 2020).

¶ 26    This court reviews *de novo* a circuit court's ruling on a motion for forensic DNA testing pursuant to section 116-3 of the Code. *People v. Morrow*, 2022 IL App (1st) 200388, ¶ 49. The well-pleaded facts in a section 116-3 motion are accepted as true and construed liberally unless contradicted by the record. *Cocroft*, 2020 IL App (1st) 180056, ¶ 21.

¶ 27    The parties agree that defendant has established a *prima facie* case for forensic testing and that the requested testing "uses a method generally accepted within the scientific community." However, the State disputes that defendant's requested testing has the potential to produce new evidence materially relevant to his claim of actual innocence.

¶ 28    "[E]vidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim." *People v. Savory*, 197 Ill. 2d 203, 213 (2001). Whether the result of the testing significantly advances the defendant's assertion

of innocence requires the evidence at trial to be evaluated, in addition to the evidence that the defendant seeks to be tested. *People v. Stoecker*, 2014 IL 115756, ¶ 33.

¶ 29    Here, defendant has failed to show that the requested testing would materially advance his claim of actual innocence. At trial, defendant challenged his identity as the offender. However, the State presented evidence from Y.L. and Reilley identifying defendant as the offender. During the incident, they observed defendant's eyes, nose, hair, and clothing. Y.L. identified defendant in a photo array and both identified him in a physical line-up. Y.L. was "1000%" confident in her identification, and Reilley also had no doubt. Further, Reilley and Malapit identified a vehicle matching defendant's vehicle as the vehicle seen fleeing from the scene. Additionally, cell tower data suggested that defendant was near the scene shortly prior to the incident.

¶ 30    In the context of that trial evidence, defendant contends that testing the hair from Y.L.'s work shirt would bolster his actual innocence claim where no forensic evidence linked him to the assault because the testing would potentially identify a third-party assailant. We disagree. The identification of a third party based on testing the hair from Y.L.'s work shirt would not materially advance defendant's claims of actual innocence. At best, it would show that Y.L.'s work shirt came into contact with another person at an unspecified time. Evidence that Y.L. merely had potential contact with someone else at the salon or elsewhere does not further defendant's actual innocence claim whatsoever.

¶ 31    Cases involving the testing of hair found in sensitive areas may be inherently suggestive of intimate contact. See, *e.g.*, *People v. Grant*, 2016 IL App (3d) 140211, ¶ 26 (denial of forensic testing reversed because testing of hair found on the victim's vaginal area could produce evidence of a third-party assailant and undermine the victim's testimony identifying defendant as the only

perpetrator).  However, the hair here was found was on CL's shirt—a piece of outerwear that could have had any number of contacts with third parties. It would not be particularly surprising or illuminating to discover another individual's hair on her shirt.

¶ 32    In sum, defendant failed to establish that the results of forensic DNA testing of the hair would produce materially relevant evidence that would significantly advance his claim of actual innocence. Therefore, we affirm the circuit court's denial of defendant's motion for forensic DNA testing.

¶ 33    Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 34    Affirmed.