2026 IL App (1st) 232093-U

FIRST DIVISION
April 27, 2026

No. 1-23-2093

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County, |
| v. | ) | Criminal Division. |
| | ) | |
| TERRY BURNETT, | ) | No. 13 CR 2220701 |
| | ) | |
| Defendant-Appellant. | ) | Honorable |
| | ) | Thomas Joseph Hennelly, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:   Evidence was sufficient to find the defendant guilty of the first degree murders of two victims beyond a reasonable doubt where eyewitnesses positively and reliably identified the defendant as the shooter and circumstantial evidence corroborated his presence at the crime scene and his participation in the shooting. It was not error, let alone, plain error, for the trial court not to *sua sponte* instruct the jury on other crimes evidence. Trial counsel's decision not to seek such an instruction was strategic, and there was no reasonable probability that had the jury been instructed otherwise, the outcome of the defendant's trial would have been different.

¶ 2 Following a jury trial in the circuit court of Cook County, the defendant, Terry Burnett, was found guilty of the first degree murders of Anthony Williamson and Robert Murphy and sentenced to mandatory natural life imprisonment. On appeal, the defendant challenges the sufficiency of the evidence used to convict him. In addition, he asserts that the circuit court committed reversible error when it improperly instructed the jury on a central issue in the case. For the following reasons, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4 On November 21, 2013, the defendant was charged with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2012)) for his involvement in the October 14, 2013, shooting at the intersection of East 82nd Street and South Maryland Avenue in Chicago, which resulted in the deaths of Williamson and Murphy.

¶ 5                                     A. Pretrial Motions

¶ 6 Prior to trial, the defendant filed several motions *in limine*. Among other things, the defendant sought to preclude the admission of hearsay statements made by two eyewitnesses to police, identifying the shooter as "T-Bone." The defendant argued that neither witness would identify the defendant as the shooter at trial: Bernadine Dukes, because she was deceased, and Natasha Baldwin, because she had since maintained that she never saw the shooting. In response, the State clarified that it was not intending to use Duke's statement at trial. With respect to Baldwin, the State indicated that if Baldwin testified and denied identifying the shooter as "T-Bone" it would impeach her with her prior statements to the police. On the other hand, according to the State, if Baldwin did not take the stand, an officer would simply testify that he proceeded to look for "T-Bone" after speaking with an unnamed witness. The court agreed with the State's position and denied the defendant's motion to preclude Baldwin's prior hearsay statements to the

police.

¶ 7     Prior to trial, the defendant also sought to preclude the admission of 18 clips taken from 10 jail calls recorded between the defendant and third parties upon his arrest. The defendant argued that the clips were irrelevant hearsay and more prejudicial than probative. In response, the State asserted that the clips were relevant because they included admissions and statements by the defendant asking others to contact witnesses who were going to testify against him in order to sway their testimony.

¶ 8     After a hearing, during which it reviewed all the recordings, the circuit court initially allowed the State to admit only 5 of the proposed 18 clips. These were identified as clips 1A, 1E, 2, 4A, and 8. Subsequently, mid-trial the State asked the court to revisit is ruling on this issue, whereupon the court permitted the State to introduce two more clips, 7 and 11. Both times, the court denied the defendant's request to introduce the entirety of the telephone calls.

¶ 9                                    B. Jury Trial

¶ 10    On December 2, 2019, the defendant proceeded with a jury trial at which the following relevant evidence was adduced.

¶ 11    Demetric Adams, a 63-year-old retired security guard, testified that on the morning of October 14, 2013, he was at home in his basement apartment at 8200 East 82nd Street in Chicago. At about 8:55 a.m., Adams was watering his plants in the window facing 82nd Street when he heard one or two gunshots. Adams exited his apartment, walked up four stairs and through two glass doors and looked north while standing in the entryway of his building with the door open. From there, he saw a "young man named T-Bone" whom he had known from the neighborhood for about six years. Adams identified "T-Bone" as the defendant. Adams explained that over the years, and before the defendant moved out of the area, he had seen the defendant "every now and

then" because the defendant had lived across the street from him in a first-floor apartment at 8201 South Maryland Avenue, with either his cousin or sister. According to Adams, the defendant had even been over to his home for a barbecue. Adams did not know the defendant's name and knew him only as "T-Bone."

¶ 12 Adams testified that as the defendant was standing on the north corner "right next to the light pole," he observed a black car driving east on 82nd Street from Cottage Grove Avenue. After Adams heard more gunshots, the black car stopped in the middle of the road and a passenger, later identified as Williamson, got out. According to Adams, Williamson put his hands up and the defendant pointed a gun at him. Adams heard gunshots and saw Williamson fall to the ground, bleeding from his mouth and head, while the black car drove off. While Adams admitted that he did not see who was shooting, he stated that he did not see anyone other than the defendant holding a gun. After witnessing Williamson fall, Adams went back inside.

¶ 13 Adams testified that he had a clear view of the defendant during the incident because it was a "nice sunny day" out, nothing was blocking his view, and the defendant, who had no face covering, looked in Adams' direction as Adams stood in the building's doorway. Adams also testified that during the incident he saw two neighbors, Dukes who was "right there at the corner" and Baldwin "who was in the window."

¶ 14 When the police arrived, Adams returned outside. Upon recognizing Chicago Police Detective Christopher Tenton from his time working with the Chicago Housing Authority, Adams pulled the detective aside and asked if they could speak over the phone later. In that moment, Adams did not tell the detective that the defendant was the shooter because he "had to get [him]self together" and did not want people from the neighborhood to see him giving a statement to the

police.

¶ 15    On the following day, Detective Tenton and Adams spoke on the phone and agreed that the detective would pick Adams up a few blocks away from his home. The two then proceeded to the police station where Adams viewed a photo array from which he identified the defendant as the person he saw "shooting the gun at the black car on 82nd Street and Maryland Avenue."

¶ 16    On October 16, 2013, Adams gave a videotaped statement to the police in which he also identified the defendant as the shooter. Two days later, he testified consistently in front of a grand jury.

¶ 17    On cross-examination, Adams denied being laid off from his job as a security guard and testified that he retired "because of his legs." After defense counsel attempted to question Adams about being fired from a different (volunteer) job, Adams denied the allegation, and then without a question pending, complained:

"You have done enough. You used to come to my house. I will tell the judge. You and your assistant came to my house, beat on my windows, brought the little drug dealers to my house, tried to offer me money about this case. Enough of you I've had. And all kind of other things have happened since."

After defense counsel asked Adams if he was saying she brought drug dealers to his house, Adams clarified that there were two sets of public defenders that had visited his home in the years leading up to the trial. Adams testified that after he spoke with the first public defender, he asked her not to bother him anymore because "the people in the neighborhood" were "coming up with different ideas" of things they were "going to do" and "there was going to be a big problem." According to Adams, when the present public defender subsequently visited his home a few years later, he "cussed [her] out the door." Adams claimed that after she left, a "young man" from the "hood"

returned and tried to give him money, but he told him to "get the h*ll away from my door." When defense counsel asked Adams why he never called the police to report people coming to his house, Adams responded that no threats were made directly to him. Instead, he stated, "[t]hey didn't say nothing to me," "[t]hey was telling other people." As Adams explained:

"Several of his friends told me about the phone calls coming from the jailhouse, and they told me that he was calling asking them to do certain things. I never paid it no attention because I don't get involved in nothing like that. That was hearsay. I never talked to him."

¶ 18    After Adams' testimony, the State called Detective Tenton, who confirmed that while canvassing the neighborhood on the morning of the shooting, he was approached by Adams, who indicated that he wanted to speak with him. The detective gave Adams his card, and when the two spoke on the phone later that day, Adams told him that he had witnessed the incident. The detective acknowledged that, at that time, Adams only told him that he had witnessed the shooting, during which he observed a "Black male" that he recognized from the neighborhood standing on the north side of the street firing at the victims but provided no further descriptions or the name of the shooter. On the following day, Detective Tenton drove Adams to the police station and conducted a photo array from which Adams identified the defendant as the shooter and stated that he knew him as "T-Bone."

¶ 19    Natasha Baldwin, a 41-year-old mother, next testified that on the morning of October 14, 2013, she was home, with her two children, in their second-floor apartment at 8200 South Maryland Avenue. At around 9 a.m. Baldwin was on a telephone call when she heard tires screeching and four to five gunshots. Baldwin looked out of the window that faced the intersection of Maryland Avenue and 82nd Street and saw an injured man, whom she did not know but who was subsequently identified as Williamson, lying on the street. She also saw a black car heading

east on 82nd Street. From her open window, Baldwin asked Williamson if he was okay. When she received no response, she ran outside to check on him and saw that he was bleeding. Baldwin remained with Williamson until the police arrived.

¶ 20    Baldwin denied speaking with Chicago Police Sergeant Richard Bednarek at the scene of the crime but admitted to having a conversation with Chicago Police Detective Lambert about an hour after the shooting. She also admitted that two days later, on October 16, 2013, she went to the police station, where she spoke with Chicago Police Detective Kent Allen. Baldwin acknowledged that she knew the defendant as "T-Bone" from seeing him in the neighborhood but denied ever telling anyone that he was the shooter. Baldwin also denied seeing the shooter's face, observing him walk toward the black car, and fleeing northbound on Maryland Avenue. Baldwin further testified that although she did not see Adams outside when she ran to assist Williamson, she subsequently saw him in a crowd of approximately 20 or 30 other people from the neighborhood. On cross-examination, Baldwin denied ever being threatened to say that she did not see the shooter.

¶ 21    After Baldwin's testimony, the State called Sergeant Bednarek. In contrast to Baldwin's testimony, the sergeant averred that after securing the scene on the morning of the shooting, he was immediately approached by Baldwin, who told him that she had observed an individual with the nickname "T-Bone" walk up to the car in the intersection, shoot at it, and then run north on Maryland Avenue. On cross-examination, Sergeant Bednarek acknowledged that he did not write a report based on this conversation with Baldwin but instead relayed this information to one of his officers, Chicago Police Officer Mason, who was assigned to fill out the case report for the incident. Sergeant Bednarek explained that, as a supervisor, his job was to instruct the officers to

put any information they received in the case report, which is what he did.

¶ 22    Chicago Police Detective Allen next testified that during his canvass of the area on the morning of the shooting, he spoke to another witness, Dukes. The parties then stipulated that Dukes had since died of natural causes. On cross-examination, defense counsel attempted to ask Detective Allen whether, when he spoke with Baldwin at the police station on October 16, 2013, she told him she did not see the shooter, but the State's hearsay objection to this line of questioning was sustained by the trial court.

¶ 23    Evidence at trial further established that when the police arrived at the intersection of 82nd Street and Maryland Avenue, at around 9 a.m. on the morning of the shooting, Williamson was already deceased. Williamson was holding what appeared to be a suspect bag of marijuana in his hand, but the police never recovered it. A few blocks east of Williamson, the police discovered the remnants of a multi-vehicle accident, involving a black Chevy Impala, which had sideswiped multiple vehicles along 82nd Street before coming to a stop at Drexel Avenue. The front windshield of the Impala was shattered with a bullet, and a second victim, subsequently identified as Murphy, was found inside, bleeding from gunshot wounds. Murphy was transported by ambulance to a nearby hospital but died of his wounds 12 days later, on October 26, 2013.

¶ 24    The medical examiner testified that the autopsies conducted on both victims revealed that Williamson suffered from a gunshot wound to the back, while Murphy suffered from a gunshot wound to the left side of his head, neither of which came from close-range firing. The medical examiner opined that the cause of death for both victims was gunshot wounds and that the manner of deaths was homicide. On cross-examination, the medical examiner acknowledged that Willaimson's autopsy revealed a plastic bag with ten smaller plastic bags inside, each containing

8

white powder, between Wiliamson's buttocks.

¶ 25    Evidence at trial further established that the police photographed the scene of the crime and recovered and inventoried, *inter alia*: a metal bullet fragment from the intersection of 82nd Street and Maryland Avenue; bullet fragments from the Impala's driver's side backseat; a fired bullet lodged in a folded-up cardboard box in the Impala's backseat; and a fired bullet lodged between the Impala's windshield and dashboard. The metal fragment from the intersection was not suitable for comparison. Ballistic testing of the fired bullet and fired bullet fragment from the vehicle established that both were fired from the same gun, which was likely either a .38 or .357caliber revolver. Police did not recover a gun, and no video surveillance captured the shooting.

¶ 26    The defendant was arrested on October 22, 2013, by Chicago Police Detective Jason Landrum.  The detective testified that after learning that the defendant's nickname was "T-Bone," he proceeded to a single-family residence in Harvey where a relative of the defendant lived. After observing an individual matching the defendant's physical description, the detective followed him into an alley, announced his office, and placed him under arrest. A photo of a tattoo on the defendant's arm, taken upon his arrest, that says "T-Bone," was introduced into evidence. Detective Landrum further testified that upon the defendant's arrest, he recovered a Motorola cell phone from the defendant's person and inventoried it. The parties stipulated that the police extrapolated a phone number ending in 7058 from that inventoried cell phone.

¶ 27    Special Agent Joseph Raschke from the Federal Bureau of Investigations (FBI) testified that, at the State's request, he performed a historical cell site analysis of the defendant's cell phone using records for the number ending in 7058. Agent Raschke explained that cell phone records are generated when cell phones interact with the cellular network by communicating with cell towers, which are divided into sides or sectors. According to Agent Raschke, whenever a cell phone is

turned on, it is scanning for radio frequencies to identify and connect to the strongest, clearest tower signal, which "usually" comes from the cell tower and sector closest to the phone, but not always. Cell phone towers and the sectors within them have overlapping coverage, otherwise there would be dead zones.

¶ 28    Agent Raschke received records for the defendant's cell phone number ending in 7058 from Sprint. He then analyzed call records for that number made between 12:43 a.m. and 9:06 a.m. on October 14, 2013. The agent found there were 44 incoming and outgoing calls made during that time, all of which utilized Sprint cell tower 534, located less than two blocks from 832 East 82nd Street. Three of those calls (made at 8:35 a.m., 8:38 a.m., and 8:42 a.m.) used sector 1 of that tower, pointing east towards the crime scene. Three other calls (made at 8:25 a.m., 9:03 a.m. and 9:05 a.m.) used sector 2 of the tower, pointing "south and a little bit west." And the remaining 38 calls utilized sector 3, which points north-west of the crime scene. The agent also noted that no calls were made or received by the phone number between 8:49 a.m. and 8:57 a.m. Based on his analysis, Agent Raschke concluded that the phone records were consistent with the defendant's cell phone being in the area of the crime scene at approximately 8:55 a.m. on October 14, 2013. Agent Raschke also analyzed calls records made by the same phone number between 9:08 a.m. and 9:17 a.m. and determined that based on the cell towers used, in those nine minutes, the phone moved away from tower 534 heading north towards I-94.

¶ 29    Cook County Department of Corrections Investigator Kimberly Hofsteadter next testified about the jail calls made by the defendant in the instant case. Hofsteadter explained that all jail calls are made through a system called Securus, which has voice recognition, records all calls, and collects the following information every time an inmate uses a telephone: the inmate's name, booking number, personal identification number, location, tier, what phone they used, the date and

time of the call, duration of the call, the call they dialed, and how the call ended. Hofsteadter testified that there had been an open subpoena for the defendant's jail calls since the date of his arrest and that during the first four months, the defendant made over 1,000 calls. Hofsteadter identified call detail reports and digital copies of phone calls made by the defendant between October 29, 2013, and December 31, 2013, and subsequently between January 9, 2014, and August 5, 2014. She then identified seven clips (1A, 1E, 2, 4A, 8, 7, and 11) taken from six telephone calls made by the defendant during that time. Those clips were published, with transcripts of the conversations played on a television screen simultaneously, to the jury.

¶ 30    Clip 1A and 1E are taken from the same 21-minute telephone call made by the defendant on October 23, 2013. Clip 1A beings at 1 minute and 22 seconds into the call. In it, a female caller informs the defendant that, according to a recent newspaper article, "the second person is man down" and is no longer "on life support." The caller tells the defendant that, according to the article, "they talking about two people that been knowing you for years talking about they seen you." The defendant asks if "they say who," but the caller only repeats that it is "two people" that have known him for years. The defendant then states: "F**k. So, they seen me." The caller confirms, stating "they seen you do the whole thing, flee the scene and sh*t," to which the defendant again responds, "they seen the whole thing." After the caller informs the defendant that "they talking about four or five times and flee the scene," the defendant says, "Man they trippin." The caller then tells the defendant that she does not know who "the second" is, but the defendant interrupts her and says that "one of them," "the female is uh Berna, right," which the caller confirms.

¶ 31    Clip 1E[1] next picks up at 13 minutes and 17 seconds into the same call. The clip begins

_____

[1] It appears that in allowing the State to introduce this clip at trial, the judge misspoke and identified the clip as "1B [from] that same date, same phone call." A review of the record, however, reveals that there is no clip

with the defendant repeating Berna's name twice to which the caller replies, "Snitch. Yeah. The snitch a\*s b\*\*\*h." The defendant then tells the caller that the police are probably also "asking the sissy" because they are "asking him and everybody that was standing around did they see." The defendant, however, states that he does not believe "sissy boy did got down on me though," or "much said" because "he stayin[g], you know what I'm saying. He, he, that's where \*\*\* he been there for years so he ain't trying to jeopardize" that. The caller responds: "Yeah, I don't think that sissy, you would have seen the little sissy \*\*\* you would have \*\*\* seen the little b\*\*\*h n\*\*\*\*r." The caller then asks the defendant whether he saw "Berna a\*s?" The defendant responds that he did not, but that everybody "says she is the main one." The caller confirms that Berna is the "main one" and that "she was going to talk to them since day one," but that "they won't get s\*\*t" from her because "she slow, she high, she f\*\*\*\*d up." The defendant responds, "But it's two, it's two.'"

¶ 32    Clip 2 is a one-minute conversation between the defendant and a male caller, named Jojo, taken from a 14-minute telephone call made on October 30, 2013. In that clip, Jojo asks the defendant why he is still in jail and the defendant responds that they "charged me bogus" because "they couldn't even find the mother\*\*\*\*\*s to point me out bro so they just went on and charged me." The defendant then tells Jojo that he doesn't know "who the second one is," but knows Berna is one of them. Jojo responds that he thinks the "black b\*\*\*h that stays on Merla" named "Andrea" is probably the other because "she was the other one that was talking to them" and "they said there was two." A female voice then interrupts the conversation to confirm that Jojo said it was "Andrea."

¶ 33    Clip 4A is a 30-second comment made by the defendant taken from a 30-minute November 2, 2013, telephone call. Therein, the defendant states that he "won't" know anything until he gets

---

1B. State's exhibit No. 70, which includes all the clips admitted at trial and published to the jury, includes only clips 1A and 1E from October 23, 2013. We shall therefore refer to this clip as 1E.

his discovery in two or three months, but that "they ain't really got nothing but the witnesses, you know what I'm saying, they got no physical evidence, no weapons, no nothing, they just want to know *** what they can come up with."

¶ 34    Clip 7 is a 48-second conversation between the defendant and two unknown callers (one female, the other younger) taken from an 18-minute phone call made on December 31, 2013. After the younger caller tells the defendant that "Big Stephan said that any n****r snitch say so," the defendant responds, "No, no, just holler uh tell him, uh, holler at the cluck and the f*g might stay in the basement on Maryland." The caller asks, "The who?" to which the defendant repeats, "The f*g might stay in the basement on Maryland," and the caller say, "Oh, ok."

¶ 35    Clip 8 is a one-minute prepaid collect call made by the defendant to his mother on January 9, 2014. In this clip, the defendant tells his mother to call "Sheriece," and tell her "she need[s] to get in contact, need to put someone on the phone cuz I need to tell her I got some news for her to take care of." The defendant continues that he needs "Sheriece" to call a phone number, which he then dictates to his mother, because "this is the mob that's getting down on me, and I need to talk to him *** call him and see what he on. His name is D. D. Adams."

¶ 36    Clip 11 is a nearly two-minute conversation between the defendant and an unidentified female caller taken from a 19-minute phone call made on August 5, 2014. The clip begins with the defendant informing the caller that "they closed discovery" and "wrapped up all the evidence" so "the next step is trial." The defendant then tells the caller that he "really need[s] to get in tune" with the "n****r that be doing that" because "I need them to really, know what I'm saying, talk to dude goofy ass." The unknown caller asks the defendant if his lawyer has talked with this person to which the defendant responds that "every time she want[s] to get" in touch with him "he like man he sick and he ain't feeling good and all," and "it's an excuse." The defendant then tells the

13

caller, "He live[s] [in] your old building," and explains that the building in which he used to live across from her old place is now in foreclosure so "he mov[ed] across the street." The defendant continues:

"I just need motherf****r, know what I'm saying, see what's up. *** Straight up man. *** Motherf****r already know what he on, so man it ain't like its no big secret. *** He know, I know *** So it ain't no big secret."

¶ 37    After the seven clips were played for the jury, the State rested.

¶ 38    The defendant moved for a directed verdict, which was denied. The defendant then rested without presenting any evidence on his own behalf, and the parties proceeded with closing arguments.

¶ 39    Relevant to this appeal, in closing, the State argued that the first words the defendant uttered after being informed that two witnesses who had known him for years had seen him committing the crime were "F***k. So they seen me." The State pointed out that the jail calls showed what was going on inside the defendant's mind within days of the incident. According to the State, after learning that there were two witnesses to the shooting, the defendant began "dissect[ing]" the evidence that the police had against him because he "ha[d] a plan of what he [wa]s going to do to make sure that not one person t[ook] that witness stand and point[ed] him out." The State argued that mentions of "Sissy boy" and "f*g" in those jail calls referred to Adams, and that the defendant was urging "Big Stefan" to start knocking on doors to "holler at these people." The State also argued that the only way the defendant knew that there were no weapons to be found at the crime scene before he received discovery in his case was because he had committed the shooting and disposed of the weapon elsewhere.

¶ 40    In response, in her closing argument, defense counsel asserted that the defendant's jail calls

14

were not evidence of anything nefarious but instead merely showed an individual attempting to find out what evidence the State had against him. In support, defense counsel pointed out that even though "a subpoena for the jail calls ha[d] been open" for the last five years, the State had given the jury only clips from calls made in the first four months of the defendant's detention. As defense counsel argued, "Don't you think if [the defendant] truly intended to sway this case one way or the other that he would have ramped up the efforts before [he] walked in here and we picked a jury so you guys c[ould] decide whether he [wa]s guilty or not guilty?"

¶ 41    After the parties' closing arguments, the jury was instructed with, *inter alia*, Illinois Pattern Jury Instruction, Criminal No. 3.06-3.07 (approved October 17, 2014) titled "Statements by Defendant" (hereinafter IPI Criminal 3.06-3.07). At the jury instruction conference, the defendant did not object to this jury instruction and at no time requested that the jury also be instructed with Illinois Pattern Jury Instruction, Criminal No. 3.14 (October 17, 2014) titled "Proof of Other Offenses or Conduct" (hereinafter IPI Criminal 3.14).[2]

¶ 42    During deliberations, the jury sent out a note asking to see the police report authored by Officer Mason from October 14, 2013. With the parties' agreement, the trial judge instructed the jury that they had "received all the evidence" and to "please continue to deliberate." The jury ultimately found the defendant guilty of the first degree murders of both victims. In addition, it found that the defendant personally discharged the firearm that proximately caused the victims' deaths.

¶ 43    On January 8, 2020, defense counsel filed a motion for a new trial. On August 5, 2020, private counsel filed an appearance, and the public defender was granted leave to withdraw. On June 16, 2022, private counsel filed a motion for an acquittal notwithstanding the verdict or a new

---

[2] For purposes of brevity, these jury instructions will be discussed in further detail in our analysis of the defendant's arguments below.

trial. One of the claims raised in that motion was that the public defender, who represented the defendant at trial, had provided ineffective assistance. The motion alleged, that trial counsel had failed to: (1) "play portions of the jail recordings, which would have given proper context" to the jail calls; and (2) object to three statements made by Adams during his testimony, namely that: (a) trial counsel had brought drug dealers to his home, who tried to offer him money; (b) trial counsel had to know they were drug dealers; and (c) friends told Adams that the defendant was calling them from jail and asking them to do "certain things."

¶ 44 On May 5, 2023, the trial court held a hearing on the defendant's posttrial motion. The public defender who represented the defendant at trial testified that she did not object, move to strike, or ask for a mistrial when Adams testified that she brought drug dealers to his house who offered him money because she thought that the statement made him "look ridiculous," and it was her trial strategy to let the jury see that. She did not object, move to strike, or ask for a mistrial when Adams testified that she had to have known that the two men she brought to his house were drug dealers because she did not bring two men with her on her visit to Adams, but instead came with one female investigator, "it was a ridiculous statement," and she could see the looks on the jurors' faces and thought that they did not believe one word Adams was saying. It was similarly part of her trial strategy not to object to Adams' answers to show that he was not a reliable witness. Furthermore, she did not object, move to strike, or ask for a mistrial when Adams testified that friends told him about the jail calls but that he never paid any attention to them because she believed this benefited the defendant as it showed that "Adams was not intimidated by any of the people" who may have tried to talk to him. Finally, trial counsel explained that she did not play any jail telephone recordings in her case-in-chief because she believed they were harmful to the

defendant and "wanted to minimize the attention" that the jury paid to them.

¶ 45    On September 29, 2023, the trial court denied the defendant's motion for an acquittal notwithstanding the verdict or a new trial, finding, *inter alia*, that trial counsel's representation did not amount to ineffective assistance. The trial court subsequently sentenced the defendant to natural life imprisonment. The defendant now appeals.

¶ 46                                II. ANALYSIS

¶ 47                          A. Sufficiency of Evidence

¶ 48    On appeal, the defendant first challenges the sufficiency of the evidence used to convict him. It is axiomatic that when reviewing such a claim, the relevant question is whether after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *People v. Jones*, 2023 IL 127810, ¶ 28; *People v. Brown*, 2013 IL 114196, ¶ 48; *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). In considering this question, as a reviewing court, our function is not to retry the defendant. *People v. Johnson*, 2026 IL 131337, ¶ 59. Instead, the jury, as the trier of fact, hears and sees the witnesses, and thus has the responsibility to adjudge their credibility, resolve any conflicts, determine the weight to afford their testimony and draw reasonable inferences from all the evidence presented. See *Brown*, 2013 IL 114196, ¶ 48; see also *People v. Pryor*, 372 Ill. App. 3d 422, 430 (2007). As a reviewing court, we will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Brown*, 2013 IL 114196, ¶ 48.

¶ 49    In order to prove the defendant guilty of the first degree murders of Williamson and Murphy, as charged here, the State was required to show that in performing the acts that caused their deaths, the defendant (1) intended to kill or do great bodily harm to them or (2) knew that his

actions would: (a) cause their deaths, or (b) created a strong probability of death or great bodily harm to them. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 59; 720 ILCS 5/9-1(a)(1), (a)(2) (West 2020). The State was also required to prove that the defendant personally discharged a firearm that caused the victims' deaths.

¶ 50    In the present case, on appeal, the defendant does not dispute that the evidence at trial unequivocally established that shortly before 9 a.m. on October 14, 2013, four or five gunshots were fired at Murphy and Williamson, who had been occupants of the same black Impala, at the intersection of 82nd Street and Maryland Avenue, ultimately killing both. The defendant similarly does not dispute that Williamson exited the vehicle and collapsed in the street at the intersection, while Murphy continued to drive the Impala eastward crashing into multiple parked vehicles along the way, before he came to a stop at Drexel Avenue, where he was found with a gunshot wound to his head, from which he died 12 days later. Instead, the defendant solely argues that the State failed to prove beyond a reasonable doubt that he was the one who shot the victims. In this respect, the defendant argues that because Baldwin recanted her identification of the defendant at trial and there was no physical evidence linking him to the crime scene, the State's entire case rested solely on the unreliable and inconsistent identification testimony of Adams, which was insufficient to establish that he was the shooter. For the following reasons, we disagree.

¶ 51    At the outset, we note that the defendant is incorrect when he asserts that the only evidence of his guilt came from Adams. The record reveals that, at trial, the State also presented multiple jail calls in which the defendant incriminated himself,[3] ballistic evidence establishing that a single

---

[3] Specifically, in Clips 1A and 1E taken from a telephone conversation made a week after the defendant's arrest, the defendant responds "F**k. So they seen me," after being informed that a newspaper article had identified two eyewitnesses to the crime who had known him for years. After the other caller confirms, "they seen you do the whole thing, flee the scene, and sh*t," the defendant states, "they seen the whole thing." The defendant then acknowledges that he already knows that one of the witnesses, "the female is Berna." He also surmises that the police are "asking the sissy," because they are "asking him and everybody that was standing around did they see." Similarly, in Clip 4A the defendant tells the caller that even though he has not received discovery in his case yet, he knows "they

weapon was used in the shooting, and testimony from FBI Agent Raschke that the defendant's cell phone was active near the crime scene on the morning of the murders, except between 8:49 a.m. and 8:57 a.m., which is the timeframe in which the shooting occurred, after which it was used again and proceeded to move north towards I-94.

¶ 52    Moreover, contrary to the defendant's position, not one, but two eyewitnesses, Adams and Baldwin, identified "T-Bone" as the shooter to police less than 24 hours after the crime had occurred. In this respect, Sergeant Bednarek testified that as soon as he secured the crime scene on the morning of the shooting, he was immediately approached by Baldwin who told him that she had seen "T-Bone" walk up to the car at the intersection and shoot at it before running down Maryland Avenue. Similarly, both Adams and Detective Tenton testified that on the following day Adams identified the defendant, whom he knew from the neighborhood as "T-Bone" as the shooter, and selected his photograph from a photo array. The State also introduced into evidence a photograph of the defendant's tattoo with the name "T-Bone" taken upon his arrest.

¶ 53    While the defendant correctly points out that Baldwin subsequently recanted her identification of "T-Bone" as the shooter and claimed she never saw the shooting, it was up to the jury as the trier of fact to decide who to believe. See *Brown*, 2013 IL 114196, ¶ 48; see also *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007) ("The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the *** jury that saw and heard the witnesses."). A recantation is "generally regarded as unreliable, especially where it might have resulted from duress or perceived threat, and it is for the trier of fact to determine the credibility of recantation testimony." *Johnson*, 2026 IL 131337, ¶ 81. Here, Adams' testimony that for the past several years leading up to the trial "people were threatening him, offering him

_____

ain't really got nothing but the witnesses *** they got no physical evidence, no weapons, no nothing."

19

money," and the jail calls regarding the defendant's attempts to identify witnesses and have third parties contact them,[4] could have led a reasonable jury to dismiss Baldwin's recantation and her denials of threats. In fact, that is exactly what the State urged the jury to do in closing argument, when it asked it to credit Baldwin's original statement to Sergeant Bednarek because her "first instinct" was to do the right thing and it was no wonder she later changed her story, considering what was happening with Adams.

¶ 54    Under this record, the guilty verdict supports the conclusion that the jurors found Baldwin to have been honest when she identified "T-Bone" as the shooter to Sergeant Bednarek, and not when she subsequently recanted her statement to the police at trial. See *People v. Rainey*, 2025 IL App (1st) 231769, ¶ 19 (a recanted prior inconsistent statement can be sufficient to support a conviction, even without corroborating evidence).

¶ 55    Regardless, even if we were to accept the defendant's position that the jury would have disregarded Baldwin's identification, which we do not, for the following reasons, we find that Adams' testimony alone was sufficient to establish that the defendant was the shooter.

¶ 56    "The testimony of a single witness is sufficient to convict" where it is "positive and credible." *Johnson*, 2026 IL 131337, ¶ 77 (citing *People v. Gray*, 2017 IL 120958, ¶ 36). When, as here, a "conviction hinges on identification evidence," courts assess the reliability of the witness' testimony by considering the five factors articulated in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) "as part of the totality of the circumstances" relevant in "reviewing the jury's

---

[4] In this respect, in Clip 1A and 1E the defendant confirms that one of the two eyewitnesses is Berna and speculates that the second one, "sissy boy[,] did [not] got down on me" or "much said" because he has lived in the neighborhood for years and "ain't tryin to jeopardize" that. In Clip 2, after the defendant tells Jojo that he does not know who the "second one is," Jojo tells him he thinks the "black b***h that stays on Merla" is the "other one that was talking to them." In Clip 7, the defendant tells the caller to "holler at the cluck and the f*g might stay in the basement." In Clip 8, the defendant gives his mother a cell phone number for "D.D. Adams" and instructs her to tell "Sheriece" to contact it because "this is the mob that's getting down on me, and I need to talk to him." In Clip 11, the defendant tells the caller that he "really need[s] to get in tune" with the "n****r that be doing that" and "talk to dude goofy a*s," after which he explains where that individual now lives because he "mov[ed] across the street."

presumed credibility determination" in favor of the State. *Johnson*, 2026 IL 131337, ¶ 72. These factors include: (1) the witness' opportunity to view the offender during the offense; (2) the witness' degree of attention at the time of the offense; (3) the witness' prior description of the offender; (4) the witness' level of certainty at the identification; and (5) the length of time between the offense and the identification. See *People v. Slim*, 127 Ill. 2d 302, 307 (1989) (adopting the *Biggers* factors); see also *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 42; *Joiner*, 2018 IL App (1st) 150343, ¶ 47.

¶ 57     In addition, in assessing the reliability of the identification testimony, we further consider "whether the witness was acquainted with the suspect before the crime." *People v. Simmons*, 2016 IL App (1st) 13100, ¶ 89. We do so because " 'whether the witness was acquainted with the suspect before the crime' is not only relevant to identification reliability; it 'is particularly important because it renders the other factors less relevant.' " *Johnson*, 2026 IL 131337, ¶ 87 (quoting *People v. Brooks*, 187 Ill. 2d 91, 130 (1999)). In the present case, Adams was well-acquainted with the defendant because the defendant had lived across the street from him for six years and had been over to Adams' house for a barbecue.

¶ 58     Moreover, all five of the *Biggers*' factors weigh in favor of reliability. First, Adams had a clear opportunity to view the defendant because it was a "nice sunny day out," nothing was blocking his view, and the defendant, who was wearing no face covering, looked at Adams as he was standing in the building doorway. Second, Adams was undoubtedly paying attention to the identity of the shooter because he was drawn outside after hearing the gunshots and subsequently described in detail the black vehicle at the intersection, the movements of Williamson and the defendant, and the location of two other witnesses, Baldwin and Dukes. Third, while Adams initially described the shooter to Detective Tenton as a "Black man" he recognized from the

neighborhood, he explained that he did not immediately identify the defendant as the shooter because he did not want anyone from the neighborhood to see him giving a statement to the police. At trial, however, Adams testified that as soon as he saw the defendant in the intersection he knew "exactly who it was" because he had known him from the neighborhood for years. Fourth, Adams' level of certainty in his identification remained unwavering, and he repeatedly identified the defendant as the shooter: from a photo array, in his videotaped statement to the police, in his testimony before the grand jury, and at trial. And finally, the length of time between the offense and Adams' identification of the defendant on the following day was minimal, particularly when explained by his desire to speak to the police without being seen by his neighbors. See *e.g.*, *Slim*, 127 Ill. 2d at 313-14 (holding that an interval of 11 days was not significant enough to negatively impact the reliability of the witness' identification); *People v. Jaimes*, 2014 IL App (2d) 121368, ¶ 35 (holding that a witness' identification of the defendant one day after the murder "clearly support[ed] a finding that the identification was valid").

¶ 59    Under this record, we find that Adams' identification of the defendant as the shooter was reliable and that his testimony alone was sufficient to prove the defendant guilty beyond a reasonable doubt.

¶ 60    The defendant nonetheless argues that we should find Adams incredible because of certain inconsistencies in his own testimony and discrepancies between his version of events and the remaining evidence offered at trial. Specifically, the defendant argues that Adams is not to be believed because: (1) he admitted that he did not actually see the defendant fire the gun; (2) unlike Baldwin, he claimed to have heard two sets of gunshots; and (3) his testimony that Williamson was shot after he exited the vehicle was contradicted by Williamson's autopsy, which showed that

Williamson was shot in the back. For the following reasons, we disagree.

¶ 61    As already noted above, it is the province of the trier of fact, and not this reviewing court, to determine the credibility of witnesses, weigh their testimony, resolve conflicts in the evidence and draw reasonable inferences therefrom. See *Brown*, 2013 IL 114196, ¶ 48; see also *Pryor*, 372 Ill. App. 3d at 430. Here, the jury heard testimony from Adams, Baldwin, and the medical examiner and assessed their credibility, resolving any inconsistencies in their testimonies, in favor of believing Adams.

¶ 62    Nothing in the record compels us to reach a different result. While it is true that at trial Adams acknowledged that he did not actually see the defendant firing the gun, he testified that after Williamson exited the vehicle, he saw the defendant aim the gun at Williamson and heard more gunshots, after which Williamson fell to the ground, bleeding, and the vehicle swerved off. Moreover, Adams clarified that, at that moment, there was no one else at the intersection with a weapon. Adams' testimony that there was only one shooter was corroborated by ballistic evidence, which confirmed that the recovered bullet and bullet fragments from the crime scene came from a single weapon. From this evidence, the jury could have reasonably inferred that because Williamson fell to the ground immediately after the defendant pointed a gun at him and Adams heard gunshots, it was the defendant who shot Williamson. We similarly reject the defendant's contention that Baldwin's testimony that she only heard one set of gunshots from inside her apartment, instead of two, refutes Adams' account of the events. Both witnesses testified that in total they heard four or five gunshots, and Baldwin had reason to adapt her testimony to fit her recantation. Nor do we agree with the defendant that Williamson's autopsy somehow impinges on Adams' credibility. Adams testified that the defendant was standing on the north corner of the intersection as the vehicle was heading east on 82nd Street. This puts the defendant on the driver's

23

side of the car, and Williamson exiting the passenger side, with his back to the defendant when he was shot, which is exactly what the autopsy found.

¶ 63    Lastly, the defendant asserts that in considering Adams' credibility we should take into account that the State offered no evidence whatsoever of a motive to explain why the defendant would have shot two people in broad daylight on a public street. Contrary to the defendant's position, however, it is well-settled that "motive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction ***." *People v. Smith*, 141 Ill. 2d 40, 56 (1990); see also *People v. Melecio*, 2017 IL App (1st) 141434, ¶ 81 ("the State is under no obligation to prove motive"); *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 55 ("The State is not required to prove motive in order to convict the defendant of first degree murder."); *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 123 ("the State has no obligation to prove a motive during a murder prosecution"); *Thompson*, 2020 IL App (1st) 171265, ¶ 77 (same). Moreover, there was evidence presented at trial from which the jury could have reasonably inferred that drugs were the motive. Specifically, a bag of suspect marijuana was observed by the police in the deceased Williamson's hand, baggies of suspect narcotics were subsequently discovered in Williamson's buttocks during his autopsy, and Adams testified that prior to trial the defendant had sent "drug dealers" to his home to influence his testimony.

¶ 64    Accordingly, under this record, and viewing the evidence in the light most favorable to the State, we find that Adams' and Baldwin's identifications of the defendant as the shooter, the cell phone tower analysis placing the defendant's cell phone in the vicinity of the crime scene at the time of the murders, the ballistic evidence confirming that only one weapon was used in the shooting, and the defendant's own jail call admissions to having been observed by two witnesses, followed by his attempts to contact these witnesses, were more than sufficient to find the defendant

guilty of both counts of first degree murder.

¶ 65                                    B. Jury Instructions

¶ 66     The defendant next asserts that the jury was improperly instructed on the limited manner in which it could consider his jail calls. The State responds, and the defendant concedes, that he has forfeited this issue for purposes of appeal because his defense counsel failed to object to the tendered instructions, request additional instructions in the circuit court, or raise this issue in a posttrial motion. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010); see also *People v. Herron*, 215 Ill. 2d 167, 175 (2005) (a defendant forfeits review of any alleged jury instruction error if he does not object to the instruction or offer an alternative and does not raise the issue in a posttrial motion); see also Ill. S. Ct. R. 366(b)(2)(i) (eff. Feb.1, 1994) (a party may not raise on appeal the failure to give a jury instruction unless that party tendered the instruction). The defendant nonetheless asks us to review this issue under the plain error doctrine, or in the alternative, grant him relief based upon the ineffective assistance of his trial counsel. We address each contention in turn.

¶ 67                                    A. Plain Error

¶ 68     Illinois Supreme Court Rule (Rule) 451(c) (Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013)) provides that "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). This rule is "coextensive" with the plain-error doctrine articulated in Rule 651(a) (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)), under which "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court," and we construe them "identically." *People v. Hartfield*, 2022 IL 126729, ¶ 49 (citing *Herron*, 215 Ill. 2d at 175); see also *People v. Sargent*, 239 Ill. 2d 166, 189 (2010); *People v. Durr*, 215 Ill. 2d 283, 296-97 (2005).

¶ 69    Under the plain error doctrine, a reviewing court may consider an unpreserved error when there was a clear and obvious error and either (1) the evidence was so closely balanced that the error itself threatened to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. In either scenario, the burden of persuasion remains with the defendant. *Herron*, 215 Ill. 2d at 187. "If the defendant fails to meet his burden, the procedural default will be honored." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 70    Because if there is no error, there can be no plain error, the first step in any plain error analysis is to determine whether there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 48; see also *People v. Brown*, 2016 IL App (1st) 151912, ¶ 13.

¶ 71    The purpose of jury instructions is to convey the correct, applicable legal principles to the jury so that it may arrive at a correct conclusion under the law and the evidence presented. *People v. Robinson*, 2016 IL App (1st) 130484, ¶ 40; *People v. Bannister*, 232 Ill. 2d 52, 81 (2008); *People v. Fuller,* 205 Ill. 2d 308, 343 (2002). This court reviews *de novo* whether the jury instructions accurately conveyed the applicable law. *People v. Mitchell*, 2018 IL App (1st) 15335, ¶ 41; *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 53. In doing so, " '[w]e must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles.' " *Hartfield*, 2022 IL 126729, ¶ 49 (quoting *People v. Parker*, 223 Ill. 2d 494, 501 (2006)). "It is sufficient if the series of instructions, considered as a whole, fully and fairly announce the law applicable to the respective theories of the People and the defense." (Internal quotation marks omitted.) *Hartfield*, 2022 IL 126729, ¶ 49 (quoting *People v. Terry*, 99 Ill. 2d 508, 516 (1984)).

¶ 72     In the present case, the jury was instructed with IPI Criminal 3.06-07, which provides:

"You have before you evidence that the defendant made statements relating to the offenses charged in the indictment. It is for you to determine what weight should be given to the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

¶ 73     The defendant concedes that it was proper to instruct the jury with IPI 3.06-07 because four of the seven jail calls (in clips 1A, 1E, 2, and 4A) contained statements he made relating to the instant offense. Relying on *People v. James*, 2017 IL App (1st) 143391, however, the defendant maintains that the remaining three calls (in clips 7, 8, and 11) do not qualify as statements he made regarding the instant crime but rather involve his commands to third parties to contact witnesses planning on testifying against him, such that it was imperative that the court also instruct the jury with IPI Criminal 3.14 regarding other crimes evidence. For the following reasons, we disagree.

¶ 74     At the outset, we note that the defendant correctly asserts that pursuant to *James*, none of the comments he made in clips 7, 8 and 11 qualify as self-incriminating statements relating to the instant crime, which would trigger the application of IPI Criminal 6.07-08.

¶ 75     In *James*, 2017 IL App (1st) 143391, this court addressed the applicability of that jury instruction to threats made by certain offenders during their commission of the crime. The State's theory was that the defendant, with three other individuals, broke into the victims' apartment to rob them of drugs and money. *Id.* ¶ 7. The victims testified that at various points the masked intruders issued orders and threats, such as, *inter alia*, demanding that the victims get out of bed or lie on the floor, ordering a female victim to take her clothes off, and threatening to stab the victims if they did not reveal where drugs and money were hidden. *Id.* ¶¶ 12-15. On appeal, this court held that it had been error—albeit harmless error—for the trial judge to instruct the jury with

IPI Criminal 3.06-3.07. *Id.* ¶¶ 137, 139. Noting that "the instruction was given based solely on the threats and commands that the codefendants directed at the victims throughout the home invasion," the court in *James* concluded that "[n]o self-incriminating *statements* *** either to law enforcement or any other third-parties, [had been] put before the jury." (Emphasis added.) *Id.* ¶ 137. The court reasoned that to qualify as a "statement," "an utterance or writing must make a claim about a matter of fact," expressing "a proposition that is either true or false." *Id.* ¶ 119. Following a thorough analysis of the instruction's history and origins (*id.* ¶¶ 120-133), the *James* court concluded that IPI Criminal 3.06-3.07 applies only "to a defendant's self-incriminating statements—confessions, admissions, or false exculpatory statements—relating to the charged offense(s)" and not to "nondeclarative utterances" like threats and commands. *Id.* ¶¶ 120, 133.

¶ 76     In the present case, clips 7, 8, and 11 do not contain any self-incriminating statements by the defendant relating to the murders charged. Instead, those clips solely include the defendant's commands to third parties to contact and speak to certain witnesses (*i.e.*, to "holler at the cluck and the f*g might stay in the basement on Maryland"; to tell "Sheriece" to call Adams and "talk to him *** call him and see what he on"; and to "talk to dude goofy a*s" because the defendant "really need[s] to get in tune" with the "n****r that be doing that," to "see what's up."). Accordingly, pursuant to *James*, these non-declarative utterances do not warrant instruction pursuant to IPI Criminal 6.07-08.

¶ 77     However, this is where our agreement with the defendant ends. For the following reasons, and contrary to the defendant's position, we find that it was not error, let alone plain error, for the circuit court not to *sua sponte* instruct the jury with IPI Criminal 3.14.

¶ 78    IPI Criminal 3.14 "provides a vehicle by which juries can be instructed on the proper manner of considering other crimes evidence" presented at trial. *People v. Jackson*, 331 Ill. App. 3d 279, 291 (2002). " '[O]ther-crimes evidence' encompasses misconduct and criminal acts that occurred before or after the alleged conduct, including acts of misconduct for which the defendant was not charged or convicted." *People v. Adams*, 2023 IL App (2d) 220061, ¶ 67). Other crimes evidence is highly prejudicial and therefore admissible only if relevant for purposes "other than to show the defendant's propensity to commit crime." *People v. Pikes*, 2013 IL 115171, ¶ 11.

¶ 79    The purpose of IPI Criminal 3.14 is to ensure that the jury does not consider other crimes evidence as evidence of the defendant's propensity to commit crime and instead limits the jury's consideration of such evidence to a particular admissible issue—in this case, according to the defendant, his consciousness of guilt. See *People v. Abernathy*, 402 Ill. App  736, 749 (2010) (evidence of other crimes or bad acts may be admitted as "evidence to show a consciousness of guilt"). IPI Criminal 3.14, modified to the facts of this case, therefore would have instructed the jurors as follows:

> "Evidence has been received that the defendant has been involved in conduct other than that charged in the indictment.
>
> This evidence has been received on the issue of the defendant's consciousness of guilt and may be considered by you only for that limited purpose.
>
> It is for you to determine what weight should be given this evidence on the issue of consciousness of guilt."

¶ 80    The defendant concedes that his defense counsel did not request that the jury be instructed in this manner. He, nonetheless, asserts that the circuit court should have, on its own motion, tendered IPI Criminal 3.14 to the jurors.

¶ 81    Contrary to the defendant's position, however, the circuit court has no duty to *sua sponte* instruct the jury. We have repeatedly emphasized that "[i]t is the parties' responsibility to prepare jury instructions and tender those instructions to the trial court. *People v. Underwood*, 72 Ill. 2d 124, 129 (1978); *People v. Turner*, 128 Ill. 2d 540, 562 (1989) ("it is the burden of the party who desires a specific instruction to present it to the court and request that it be given to the jury".) Accordingly, as a general rule " 'the trial court is under no obligation *** to give jury instructions not requested by counsel[.]' " *People v. Alexander*, 408 Ill. App. 3d 994, 1001 (2011) (quoting *Underwood*, 72 Ill. 2d at 129); see also *People v. Creager*, 172 Ill. App. 3d 807, 822 (1988); *People v. Mullen*, 80 Ill. App. 3d 369, 376 (1980). The purpose of this rule is to avoid shifting the burden of advocacy from the litigants to the trial judge. *People v. Parks*, 65 Ill. 2d 132, 137 (1976). Moreover, a defendant may not sit idly by at trial and then on appeal point a finger of blame at the trial judge for that which the defendant believes, in hindsight, ought to have been done. *Id.*; see also *People v. Grant*, 71 Ill. 2d 551, 557-8 (1978) ("If a defendant *** fails to tender jury instructions *** he cannot expect the trial court, unaided, to divine his intent.")

¶ 82    While the rule has exceptions, our supreme court has repeatedly held that "the only situations where a fair trial requires the court to *sua sponte* offer an instruction include 'seeing that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof.' " *Turner*, 128 Ill. 2d at 562-63 (quoting *Parks*, 65 Ill. 2d at 137); see also *People v. Koen*, 2014 IL App (1st) 113082, ¶ 46; *People v. Green*, 225 Ill. 2d 612, 622 (2007). Moreover, our supreme court has explicitly held that tendering IPI Criminal 3.14 does not fall into the category of such exceptions because it "does not involve any of these issue." See *Turner*, 128 Ill. 2d at 562-63. "The circuit court" therefore "does not have a duty to *sua sponte* deliver IPI Criminal *** 3.14." *People v. Maya*, 2017 IL App (3d) 150079, ¶ 94.

30

¶ 83    In the present case, the defendant does not allege that the jury was improperly instructed on presumption of innocence, the burden of proof, or any of the elements of first degree murder. Therefore, pursuant to our supreme court's precedent, he cannot establish that the failure of the trial court to instruct the jury with IPI 3.14 on its own motion amounted to error. See *Turner*, 128 Ill. 2d at 562-63 (holding that the trial court's failure to *sua sponte* give IPI Criminal 3.14 did not constitute error because the instruction did not involve the presumption of innocence, burdens of proof, or the elements of the charged offense); *but see People v. Johson*, 2021 IL App (1st) 190567 ¶ 21 (agreeing with the State's concession that it was error for the circuit court not to *sua sponte* instruct the jury with IPI Criminal 3.14). And, because there was no error, there can be no plain error, and we need not review this otherwise forfeited issue. See *Brown*, 2016 IL App (1st) 151912, ¶ 13.

¶ 84    Even if we were to agree with the defendant that the court somehow committed an instructional error, we conclude that the error did not amount to plain error because the evidence of the defendant's guilt was not closely balanced and the error did not result in an unfair trial for the defendant, nor impacted the integrity of the judicial process.

¶ 85    As already discussed above, the evidence of the defendant's guilt at trial was overwhelming. Two eyewitnesses identified the defendant as the shooter, ballistic evidence confirmed that a single weapon was used in the crime, and cell site analysis showed the defendant's cell phone active near the crime scene throughout the morning of the murders, except in the eight minutes when the shooting happened, after which it moved north towards I-94. In addition, the defendant made an admission, by responding "F**k. So they seen me," to information that eyewitnesses who had known him for years had identified him as the shooter and described what he had done. The defendant, on the other hand, presented no evidence in his own defense. Under

this record, the defendant cannot establish that the evidence at trial was so closely balanced that the alleged instructional error alone threatened to tip the scales of justice against him. As such, he fails under the first prong of plain error review.

¶ 86    The defendant similarly cannot succeed on the second prong. This prong requires "a systemic error which serves to erode the integrity of the judicial process and undermine[s] the fairness of the defendant's trial." (Internal quotation marks omitted.) *Thompson*, 238 Ill. 2d at 613-14; see also *Hartfield*, 2022 IL 126729, ¶ 49 (quoting *Herron*, 215 Ill. 2d at 193 (quoting *People v. Hopp*, 209 Ill. 2d 1, 8 (2004))) ("a jury instruction error rises to the level of plain error only when it " 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' "). The alleged instructional error in this case does not rise to that level.

¶ 87    The record below demonstrates that clips 7, 8 and 11, revealing the defendant's attempts to locate witnesses through third parties, were not offered as propensity evidence and the jury was not explicitly instructed to consider them as such. Instead, the clips were introduced at trial to rehabilitate Adams after his implausible accusations on cross-examination that the public defender had brought "drug dealers" to his home. Moreover, nothing in the record even remotely suggests that the jury placed undue importance on these three calls or considered those calls as anything other than corroboration of Adams' testimony. *C.f. Johson*, 2021 IL App (1st) 190567 ¶ 21 (holding that the conceded instructional error rose to the level of second prong plain error because the jury's question in deliberations indicated that the jury was singularly focused on the other crimes evidence). By *sua sponte* instructing the jury to consider the clips as something more than merely corroborative evidence, namely "other conduct" exclusively evincing "the defendant's consciousness of guilt," the court would have attached undesirable labels to those calls and given

them undue significance in contravention of defense counsel's theory, which, as we shall discuss below, was to portray them as innocuous. Because "[a] defendant is entitled to *** instruction[s] consistent with his theory of the case," the defendant cannot show that the alleged instructional error impacted the fairness of his trial or the integrity of the judicial process. *Miller*, 259 Ill. App. 3d 257, 264 (1994).

¶ 88                                     A. Ineffective Assistance of Counsel

¶ 89    The defendant's alternative argument that defense counsel rendered deficient performance by failing to request IPI Criminal 3.14 also fails. To succeed on a claim of ineffective assistance of counsel, a defendant must show both: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) prejudice stemming from that performance, *i.e.*, that there is a reasonable probability that but for counsel's deficient performance the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001). "A defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim." *People v. Palmer*, 162 Ill. 2d 465, 475 (1994) (citing *Strickland*, 466 U.S. at 687).

¶ 90    Under the first prong of *Strickland*, the defendant "must overcome the strong presumption" that counsel's performance fell within the range of reasonable professional assistance and that "the challenged action or inaction *** was the product of sound trial strategy." *People v. Coleman*, 183 Ill. 2d 366, 397 (1988); see also *Palmer*, 162 Ill. 2d at 476 ("[M]istakes in trial strategy or tactics or in judgment do not themselves render the representation incompetent." (Internal quotation marks omitted.)) "Counsel's choice of jury instruction is considered a tactical decision" and "will typically not support a claim of ineffective representation." *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010).

¶ 91    Where evidence of other bad acts is introduced at trial, counsel can choose not to request

IPI Criminal 3.14 as "trial strategy in order to avoid drawing undue attention to the other-crimes

evidence." *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52. Counsel's decision not to tender this

instruction will "support a claim of ineffective assistance *** only if that choice is objectively

unreasonable." *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 97.

¶ 92    In the present case, the defendant fails to rebut the presumption that counsel's decision not

to request IPI Criminal 3.14 was strategic or objectively reasonable. Counsel was clearly aware of

the nature of the other crimes evidence in clips 7, 8, and 11, having offered a motion *in limine*

attempting to exclude it. Moreover, in her subsequent testimony at the hearing on the defendant's

posttrial motion, counsel explicitly stated that she believed the jail calls were unfavorable to the

defendant and therefore consistently sought "to minimize the attention that the jury paid to [them]."

In that vein, throughout trial, counsel painted the calls as innocuous. In her closing argument, she

tried to convince the jury that instead of threats or witness tampering these calls merely reflected

attempts by the defendant to find out what evidence the State had against him upon his arrest.

Instructing the jury with IPI Criminal 3.14 would have labeled the defendant's mere attempts at

obtaining information as "consciousness of [his] guilt," thereby giving validity to the State's theory

that the defendant was attempting to improperly influence witnesses against him. Under this

record, we find that counsel reasonably chose not to request IPI Criminal 3.14.

¶ 93    Moreover, the defendant cannot show prejudice stemming from counsel's conduct. As

already noted above, because the evidence of the defendant's guilt was overwhelming, the jurors

did not need to rely on the defendant's statements in the jail calls as evidence of his propensity to

commit crimes in order to convict. Furthermore, instructing the jury with IPI Criminal 3.14 would

have done more harm than good, as the jurors would have focused on those calls as evidence of

"consciousness of guilt" rather than harmless attempts by the defendant to learn what evidence the State had against him. Accordingly, there was no reasonable probability that but for counsel's failure to instruct the jury with IPI Criminal 3.14 the outcome of the defendant's proceedings would have been different. The defendant has therefore failed to establish that counsel rendered inadequate representation.

¶ 94                                    III. CONCLUSION

¶ 95    For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 96    Affirmed.